150 A.3d 435

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Michael R. VEON, Appellant**

**Commonwealth of Pennsylvania, Appellee**

v.

**Michael R. Veon, Appellant**

**No. 69 MAP 2015**
**No. 70 MAP 2015**

Supreme Court of Pennsylvania.

ARGUED: May 10, 2016

DECIDED: November 22, 2016

444

Bruce Richard Beemer, Esq., Pennsylvania Office of Attorney General, Kelly M. Sekula, Esq., for Com. of Pennsylvania, Appellee.

Joel Stephen Sansone, Esq., Scanlon & Sansone, for Michael R. Veon, Appellant.

Jonathan F. Bloom, Esq., Karl Stewart Myers, Esq., Stradley, Ronon, Stevens & Young, L.L.P., William Haselden Ellerbe, Esq., for The General Assembly of the Com. of Pennsylvania, Amicus Curiae.

Robin M. Hittie, Esq., Pennsylvania State Ethics Com'n, for PA State Ethics Com'n, Amicus Curiae.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.

Justice Wecht announces the Judgment of the Court and delivers the Opinion of the Court, except with respect to footnote 29 and Part III(A). Justice Dougherty joins the opinion in full. Chief Justice Saylor and Justice Donohue join Parts I and II, and III(B) except with respect to footnote 29. Justice Todd joins Parts I, II, and III(B) of the opinion. Justice Baer joins Part II(C) only.

## OPINION

JUSTICE WECHT

We granted allowance of appeal to consider whether Pennsylvania's statute criminalizing conflicts of interest,[1] which prohibits public officials from leveraging the authority of their offices for "private pecuniary benefit," extends to what the trial court in this case referred to as "intangible political gain." As well, we must determine whether the Commonwealth may receive restitution following prosecution of a public official for a crime involving unlawful diversion of public resources.[2]

---

1. See 65 Pa.C.S. § 1103(a) (conflict of interest), *deemed unconstitutional in part by* Shaulis v. Penna. State Ethics Comm'n, 574 Pa. 680, 833 A.2d 123 (2003) (holding Subsection 1103(g) unconstitutional "to the extent that it regulates the conduct of former government employees who are also attorneys"); see also 65 Pa.C.S. § 1102 (defining "conflict of interest").

2. See 18 Pa.C.S. § 1106 (restitution for injuries to person or property).

## I. Background

Appellant Michael R. Veon, a twenty-two-year member and eventual Minority Whip of the Pennsylvania House of Representatives (Fourteenth Legislative District, Beaver County), was entitled to $20,000 annually to cover business expenses associated with maintenance of a district office, as well as $4,000 for postage.[3] Mr. Veon also was allotted up to $650 per month for a vehicle and $1,650 to be used for the monthly rent for his district office. Any unused balance of the latter $2,300 per month allotment could not be diverted for other purposes. Mr. Veon was expected to draw upon his general $20,000 allocation to pay any vehicular or rental charges in excess of those allotments. Pursuant to House Democratic Caucus ("Caucus") procedures, Mr. Veon could seek additional funds from Caucus leadership if he exhausted his $20,000 allocation, and it was not uncommon for Caucus members to do so. However, trial testimony established that, because such supplemental allotments are matters of public record, some members hesitated to request them for fear of provoking political blowback from constituents.

In 1991, Mr. Veon formed the Beaver Initiative for Growth ("BIG"), a non-profit corporation. BIG received all of its funding from public sources, primarily through the Pennsylvania Department of Community and Economic Development ("DCED"). BIG was administered by two "co-chairs," Mr. Veon and then–State Senator Gerald Lavalle, who was invited to serve as co-chair by the individual in charge of Mr. Veon's district office, Annamarie Perretta–Rosepink.[4] However, Mr.

3. The following factual narrative is based upon the Commonwealth's evidence. Due to the nature of our disposition, it is unnecessary to note Mr. Veon's disputes with the Commonwealth's account.

4. Ms. Perretta–Rosepink was charged simultaneously with Mr. Veon for various offenses arising out of the events detailed herein. They were tried before, and convicted by, the same jury. The Superior Court affirmed Ms. Perretta–Rosepink's several convictions. Commonwealth v. Perretta–Rosepink, 120 A.3d 372 (Pa. Super. 2015) (unpublished). Ms. Perretta–Rosepink has filed a petition for allowance of appeal with this Court, and we have deferred disposition of that petition pending the outcome of the instant appeal. See Commonwealth v. Perretta–Rosepink, Order, 194 MAL 2015, Aug. 21, 2015 (per curiam ).

Lavalle admitted that his role in BIG's operations was quite limited.

According to John Gallo, BIG's executive director from 1999–2003, BIG initially occupied, rent-free, the second floor of a bank-owned building in Beaver Falls, over a first-floor space occupied by Mr. Veon's district office. When Mr. Gallo was hired, BIG effectively had conducted no operations for at least a year, its records were strewn about the office, the only furniture in its space was a large table, and the building in general was in poor condition. Thus, with Mr. Veon's and Ms. Perretta–Rosepink's support, Mr. Gallo took it upon himself to seek new office space for BIG. Thereafter, Ms. Perretta–Rosepink informed Mr. Gallo that she had negotiated a lease in another facility (the "Beaver Office") at a rental rate of $2,900 per month. Because this well exceeded Mr. Veon's $1,650 rental allotment, Ms. Perretta–Rosepink explained, BIG would take on the lease and sublet space in the new facility to Mr. Veon's district office. Although BIG was the named lessor, Mr. Veon's district office occupied substantially more of the space than BIG. Moreover, according to Mr. Gallo, once the two tenants were established in the new space, no sign was installed to indicate that BIG was an occupant of its own putative headquarters. Anyone seeking to visit BIG would enter through Mr. Veon's office. BIG nonetheless paid $1,400 of the $2,900 rental fee, leaving Mr. Veon responsible for the $1,500 balance, $150 less than his $1,650 allotment for that purpose.

When Mr. Gallo returned from a month-long leave of absence from his position with BIG, he found that Ms. Perretta–Rosepink had drawn a check for $2,100 from BIG's account to the benefit of a person whom Mr. Gallo did not recognize. When asked, Ms. Perretta–Rosepink told Mr. Gallo that the check had been written to the landlord of an additional office, located in Midland, Pennsylvania ("Midland Office"). She explained that, due to redistricting, Mr. Veon's district now included Midland, which was geographically separate from the remainder of Mr. Veon's district, and that Mr. Veon did not want Midland constituents to have to travel to the Beaver

Office. Because Mr. Veon had insufficient funds for a satellite office, BIG would pay the rent for the Midland office as well. Mr. LaValle testified that the Midland Office appeared to him to be functioning as a legislative office. Daniel Woodske, BIG's director of marketing, testified that he was surprised to learn that BIG leased the Midland Office, a discovery he made when he dropped by to "say hello." Once there, Mr. Woodske observed a door with a BIG sign on it, which opened onto "just pretty much maybe a six by eight room." Notes of Testimony ("N.T."), 2/22/2012, at 35–36. During his five years at BIG, Mr. Woodske used the Midland Office approximately twenty times, always for meetings with individuals whom he wanted to spare any inconvenience in traveling to Beaver Falls. According to Ms. Perretta–Rosepink, the rental fee for the Midland Office was $2,100.

It was Mr. Veon who arranged to rent a third space, located in Pittsburgh's South Side neighborhood (the "South Side Office"), which was leased by BIG from March 2005 through November 2005. The space was located on the second floor of a building owned by Mr. Veon's friend, Marc Adams, whose cigar shop occupied the first floor. The terms of the lease called for BIG to pay $2,500 for the first four months of occupancy, and $1,500 per month thereafter. The rented space bore no indication that it was occupied by BIG, and contained only two desks and a computer. Thomas Woodske, who succeeded Mr. Gallo as BIG's executive director in or around 2003, learned about the lease from his son, Daniel. Thomas Woodske perceived no need for the South Side Office. The only person who used that office was Angela Bertugli. Ms. Bertugli was hired by Michael Manzo, Representative Bill DeWeese's chief of staff, to perform legislative and policy research for the Caucus. She testified that she knew nothing about BIG prior to her employment at the South Side Office.

Mr. Veon and Ms. Perretta–Rosepink took primary responsibility for BIG's operations, with Ms. Perretta–Rosepink paid to serve as the organization's fiscal director. Mr. Veon made the hiring decisions for BIG.

BIG subsisted entirely, or almost entirely, on public monies obtained by Mr. Veon through applications prepared by Mr. Veon, signed *pro forma* by Mr. Gallo, and filed with DCED. After Mr. Gallo's tenure ended, Thomas Woodske took over as signatory for the grant applications. Thomas Woodske testified that Ms. Perretta–Rosepink would present him with only the signature page of these applications, and that she explained that his signature was required to ensure that no legislative employee would sign applications seeking Commonwealth grants.

Based upon these facts, Mr. Veon was charged with various offenses.[5] After some charges were withdrawn, Mr. Veon went to trial on nineteen counts. He and Ms. Perretta–Rosepink were tried before a jury over a three-week period. Following the parties' presentations and before closing arguments, the trial court instructed the jury. In the portion of the jury charge that is relevant to Mr. Veon's instant challenge, the court defined the pecuniary requirement in the conflict of interest statute [6] as follows: "Private pecuniary benefits in-

---

**5.** Mr. Veon was tried separately for his direct involvement with the improper award of bonuses to Commonwealth employees for performing campaign work on state time. On or about June 18, 2010, the Court of Common Pleas of Dauphin County, at 4656 CR 2008, entered a judgment of sentence against Mr. Veon on fourteen counts of, *inter alia,* theft of services, conflict of interest, theft by deception, and conspiracy, sentencing him to an aggregate five years and nine months to fourteen years' incarceration and imposing restitution of nearly $1.9 million. Mr. Veon's direct appeal of his judgment of sentence was quashed as untimely. Most recently, the Superior Court dismissed as untimely his petition for relief under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541, *et seq.* See generally Commonwealth v. Veon, 1128 MDA 2014, 2015 WL 7301687 (Pa. Super. April 10, 2015) (unpublished). That decision has not been appealed, and those proceedings have no bearing upon our disposition of the instant matter.

**6.** 65 Pa.C.S. § 1103(a) ("Conflict of interest") provides that "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." "Conflict of interest" is defined as follows:

"**Conflict**" or "**conflict of interest.**" Use by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated. The term does not include an action having a de minimis economic impact or which affects to the same

cludes [*sic*] intangible political gain such as garnering favorable publicity, obtaining free publicity, enhancing standing in the community or the like." N.T., 3/1/2012, at 23–24.[7]

On March 5, 2012, a jury convicted Mr. Veon of one count of restricted activities, conflict of interest (count 1);[8] two counts each of theft by unlawful taking or disposition (counts 3 and 5) (hereinafter "theft by unlawful taking"),[9] theft by deception (counts 7 and 9),[10] theft by failure to make required disposition of funds received (counts 11 and 13) (hereinafter "theft by failure to make required disposition"),[11] and misapplication of entrusted property and property of government or financial institutions (counts 15 and 17) (hereinafter "misapplication of entrusted property");[12] and one count of criminal conspiracy (theft by unlawful taking or disposition) (count 19).[13, 14]

degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. § 1102.

7. Notably, the Commonwealth's closing argument relied upon the jury charge in this regard. See N.T., 3/1/2012, at 74 ("We're not limited to money. All this reference to Mike Veon didn't get paid by [BIG], that this money didn't go directly into his pocket, that's not what our burden of proving to you is. ... There are other benefits, intangible benefits, that Representative Veon received, and that's garnering favorable publicity and free publicity and enhancing his standing in the community so he can continue to be reelected.").

8. 65 Pa.C.S. § 1103(a). The verdict sheet specified the putative financial elements of this charge as "(Rent/legislative district office); and/or (Rent/South Side Pittsburgh office); and/or (Foreman retainer)." This is relevant insofar as the jury acquitted Mr. Veon of a second count of conflict of interest.

9. 18 Pa.C.S. § 3921(a).

10. 18 Pa.C.S. § 3922(a)(1).

11. 18 Pa.C.S. § 3927(a).

12. 18 Pa.C.S. § 4113(a).

13. 18 Pa.C.S. § 903.

14. The jury also acquitted Mr. Veon of a second count of conflict of interest ("Delta/Mark Veon higher salary") (count 2); and one count each of theft by unlawful taking, theft by deception, theft by failure to make required disposition, and misapplication of entrusted property,

On June 19, 2012, the trial court sentenced Mr. Veon to an aggregate twelve to forty-eight months' incarceration, to be followed by forty-eight months of intermediate punishment.[15] The court further ordered Mr. Veon to pay court costs, $1,500 in fines, and $119,000 in restitution, subject to further proceedings to determine a more precise amount of restitution. Mr. Veon then filed post-sentence motions. The court denied relief on all but one of Mr. Veon's claims, granting his request for a hearing concerning restitution. On September 24, 2012, Mr. Veon filed a notice of appeal to the Superior Court. On September 25, 2012, the trial court convened the restitution hearing.

On November 8, 2012, the trial court refined Mr. Veon's restitutionary sentence to $135,615, payable to DCED. See Order, 11/8/2012. On December 7, 2012, Mr. Veon filed a notice of appeal of the modified restitution order.[16] The trial

which specifically pertained to "Foreman retainer" (counts 6, 10, 14, and 18, respectively). See Verdict Slip, 3/5/2012, at 1–4.

15. For conflict of interest and each of Mr. Veon's convictions for theft by unlawful taking (counts 1, 3, and 5, respectively), the court sentenced Mr. Veon to twelve to forty-eight months' incarceration, to run concurrently with one another. The court further found that count 7 (theft by deception) and count 11 (theft by failure to make required disposition) merged for sentencing with count 3, and that counts 9 (theft by deception) and 13 (theft by failure to make required disposition) merged for sentencing with count 5. For counts 15 and 17 (misapplication of entrusted property), the court imposed forty-eight-month intermediate punishment sentences to run concurrently with one another, and for conspiracy, the court sentenced Mr. Veon to twelve to forty-eight months' incarceration, to run concurrently with counts 1, 3, and 5. See Sentencing Order, 6/28/2012. The trial court further directed that Mr. Veon's sentences for supervision would run consecutively to the sentence imposed upon Mr. Veon for his earlier conviction at 4656 CR 2008, see supra n.5.

16. The Superior Court, observing correctly that restitution is a sentence, and thus determining that the court's second order merely modified the existing judgment of sentence, quashed Mr. Veon's second appeal, viewing the first appeal of his judgment of sentence as the appropriate vehicle to challenge all aspects of his judgment of sentence. See Veon, 109 A.3d at 762–63; see generally Commonwealth v. Harner, 533 Pa. 14, 617 A.2d 702, 704 (1992) (recognizing Section 1106 restitution as a "direct sentence"). Despite the fact that the Superior Court quashed Mr. Veon's second appeal and purported to modify its caption, both Superior Court docket numbers remained in the caption

court associated $116,615 of the restitution obligation, concerning the office rents for the Beaver and Midland Offices, with counts 1, 3, 7, 11, 15, and 19 (conflict of interest, theft by unlawful taking, theft by deception, theft by failure to make required disposition, misapplication of entrusted property, and conspiracy, respectively), and imposed it jointly and severally with co-defendant Ms. Perretta–Rosepink. The remaining $19,000, associated with the South Side Office, was imposed solely upon Mr. Veon at counts 1, 5, 9, 13, 17, and 19 (conflict of interest, theft by unlawful taking, theft by deception, theft by failure to make required disposition, misapplication of entrusted property, and conspiracy, respectively). Id.

On February 6, 2015, in a published decision, the Superior Court affirmed Mr. Veon's judgment of sentence in part, but upheld the restitution order only as to certain counts, vacating it as to others. See Commonwealth v. Veon, 109 A.3d 754 (Pa. Super. 2015). The Superior Court determined that the jury's verdict regarding counts 1 (conflict of interest), 3 (theft by unlawful taking), 7 (theft by deception), 11 (theft by failure to make required disposition), 15 (misapplication of entrusted property), and 19 (conspiracy) did not specify which particular legislative office was associated with the theft. Thus, the trial court had no basis upon which to assume that Mr. Veon's thefts specifically were associated with the Beaver Falls and/or Midland offices, which, in turn, called into question the basis for the trial court's calculations. Absent such a basis for the amount of restitution imposed, an award of restitution could not be imposed upon those counts. Id. at 772. Conversely, with respect to counts 5 (theft by unlawful taking), 9 (theft by deception), 13 (theft by failure to make required disposition), and 17 (misapplication of entrusted property), expressly concerning amounts associated with the South Side Office, the evidence established such a basis. Consequently, having determined that DCED could be a victim under the restitution statute, the Superior Court effectively affirmed just the $19,000 restitutionary penalty associated with the South Side

of its published decision. Accordingly, Mr. Veon filed his petition for allowance of appeal at both Superior Court dockets.

Office. However, the Superior Court directed the trial court upon remand "to determine if there is an appropriate method to calculate restitution in light of [the court's] decision regarding" counts 1, 3, 7, 11, 15, and 19, the counts associated with the Beaver and/or Midland Offices. Id. at 773.

## II. Analysis

Mr. Veon filed a timely petition for allowance of appeal, which this Court granted on August 20, 2015. We granted review as to the following questions:

1. Whether the Pennsylvania conflict of interest law is unconstitutionally vague on its face, and whether, as applied in this case, the trial court improperly expanded the definition of "private pecuniary interest" to include "intangible political gain," thereby threatening the constitutional rights of all elected officials in Pennsylvania[?] [17]

2. Whether the restitution ordered in this case was improper[ ] because the Commonwealth cannot be a victim under the subject criminal statutes[?] [18]

See Commonwealth v. Veon, 121 A.3d 954 (Pa. 2015) (*per curiam*). We heard argument on May 10, 2016. The case is ripe for disposition.

### A. Concerning the constitutional question.

■ Before we can analyze Mr. Veon's challenge to the conflict of interest statute, we must determine the correct analytic framework for the inquiry. Mr. Veon's presentation conflates several distinct lines of argument, and appears substantially to meld questions of constitutional vagueness and overbreadth, while focusing upon the putative infringement of

17. The General Assembly of the Commonwealth of Pennsylvania has filed a brief as *amicus curiae* in support of Mr. Veon's argument that Sections 1102 and 1103 are void for vagueness. The Pennsylvania State Ethics Commission has filed a brief as *amicus curiae* in support of the Commonwealth's position that those sections are neither facially unconstitutional nor unconstitutionally vague as applied in this case.

18. The Superior Court's detailed parsing of the award's components and the sufficiency of the evidence as to each has not been challenged by either party.

Mr. Veon's protected right to freedom of speech in his capacity as an elected representative. At root, however, Mr. Veon's challenge begins with the simpler question of whether the trial court's interpretation of Section 1102 and its consequent jury charge conformed to that statute's terms.

We acknowledge that the lower courts did not address Mr. Veon's challenge as a non-constitutional challenge. However, their rulings necessarily turned upon their respective determinations regarding Section 1102's scope. Neither they nor we can assess a question of statutory vagueness or overbreadth without first determining the intended meaning of the statute, and we are bound to interpret a statute, where possible, in a way that comports with the constitution's terms. 1 Pa.C.S. § 1922 (directing us to presume "[t]hat the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth").

We reach a constitutional challenge only when we find no tenable interpretation of the statute in question that obviates the necessity of doing so. "When the validity of [a statute] is drawn in question, and if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." Commonwealth v. Monumental Props., Inc., 459 Pa. 450, 329 A.2d 812, 827 (1974) (quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)). In MCI WorldCom, Inc. v. Penna. Pub. Utility Comm'n, 577 Pa. 294, 844 A.2d 1239 (2004), we explained the governing principle as follows:

The "canon of constitutional avoidance" provides that when a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter. See Harris v. United States, 536 U.S. 545, 555, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) .... Pennsylvania explicitly recognizes this canon by statute in instances where construction of a Pennsylvania statute is at issue. See

456

1 Pa.C.S. § 1922; see also Commonwealth v. Bavusa, 574 Pa. 620, 832 A.2d 1042, 1050–51 (2003).

MCI WorldCom, 844 A.2d at 1249–50; see Mt. Lebanon v. Cnty. Bd. of Elections, 470 Pa. 317, 368 A.2d 648, 650 (1977) ("[W]e should not decide a constitutional question unless absolutely required to do so."). Thus, the threshold statutory interpretation directed by our case law necessarily is encompassed by the duly preserved constitutional challenge.

The premise underlying all of Mr. Veon's arguments—both below and before this Court—is that the trial court impermissibly expanded the conduct specifically proscribed by Section 1102 when it instructed the jury that it could find a "private pecuniary benefit" if the Commonwealth established that Mr. Veon received an "intangible political gain" through prohibited activities. See Veon, 109 A.3d 754, 761–62 (asking, inter alia, "whether the trial court improperly expanded the definition of ... 'private pecuniary interest' to include intangible political gain?"). Thus, we are presented first with a question of statutory interpretation. For the reasons set forth below, we find that Section 1102 is amenable to an interpretation that eliminates the necessity of constitutional inquiry. In fact, the only reasonable interpretation of Section 1102 preempts such an inquiry.

**B. The extension of the conflict of interest statute to encompass "intangible political gain."**

Section 1103, "restricted activities," provides that "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." Section 1102 defines a "conflict" or "conflict of interest" as follows:

Use by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the *private pecuniary benefit* of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated. The term does not include an action having a de minimis economic impact or which affects to the same degree a class consisting of the

general public or subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. § 1102 (emphasis added).

■■■ To determine whether a jury instruction faithfully characterized the statute upon which it is based, we first must determine the scope and meaning of the provision in question, thus furnishing a rubric for our inquiry. Statutory interpretation presents a question of law, which we resolve *de novo*. Robinson Twp., Washington Cnty. v. Commonwealth, 623 Pa. 564, 83 A.3d 901, 943 (2013). Once we have established the meaning and scope of the statute, we must determine whether the trial court, which enjoys broad discretion in fashioning its jury charge, "clearly, adequately, and accurately" related the law, so understood, to the jury. Commonwealth v. Lesko, 609 Pa. 128, 15 A.3d 345, 397 (2011). "Only when the court commits an abuse of discretion or provides the jury with an inaccurate statement of law is there reversible error." Commonwealth v. Brown, 605 Pa. 103, 987 A.2d 699, 712 (2009) (citing Commonwealth v. Hall, 549 Pa. 269, 701 A.2d 190, 207 (1997)). Furthermore, even if an instruction is erroneous, relief is due only when the error is prejudicial. Commonwealth v. Thompson, 543 Pa. 634, 674 A.2d 217, 219 (1996).

■■■ Because the conflict of interest statute provides no specific definition of "private pecuniary benefit" or any of its constituent words, we must look first to the words' common and approved usage, with the emphasis upon "pecuniary." See 1 Pa.C.S. § 1903 ("Words and phrases shall be construed according to rules of grammar and according to their common and approved usage . . . ."). "When the words of a statute are clear and free from all ambiguity, they are presumed to be the best indication of legislative intent." Kirsch v. Public Sch. Employees' Ret. Bd., 603 Pa. 439, 985 A.2d 671, 674 (2009) (quoting Chanceford Aviation Props., L.L.P. v. Chanceford Twp. Bd. of Supervisors, 592 Pa. 100, 923 A.2d 1099, 1104

(2007)). Only if the words are not explicit on the question presented may we resort to principles of statutory construction. Id. (citing Commonwealth v. Fedorek, 596 Pa. 475, 946 A.2d 93, 98–99 (2008)). When the statute's language is unambiguous, we will not disregard its meaning under the pretext of pursuing its spirit. Id.

"Pecuniary" commonly is defined as "[o]f, relating to, or consisting of money; monetary." Black's Law Dictionary 1312 (10th ed. 2014); see American Heritage College Dictionary 1006 (3d ed. 1993) ("Of or relating to money"). "Pecuniary benefit," in turn, is defined as "[a] benefit capable of monetary valuation." Black's Law Dictionary 188 (10th ed. 2014); see Commonwealth v. Moran, 629 Pa. 68, 104 A.3d 1136, 1147 n.12 (2014) (noting that the Ethics Act Section 1102 "specifically limits the type of benefit prohibited" to a "pecuniary" benefit); cf. 65 Pa.C.S. § 403, *repealed by* Act of Oct. 15, 1998, P.L. 729, No. 93 § 6(a)(2) (Ethics Act's predecessor provision to Sections 1102 and 1103, which prohibited receipt of something of *"monetary value"* including "a gift, loan, political contribution, reward or promise of future employment").

Indeed, our own Crimes Code offers a definition of "pecuniary benefit" that pays due regard to the conventionally understood meaning of the word "pecuniary": "Benefit in the form of money, property, commercial interests, or anything else *the primary significance of which is economic gain.*" 18 Pa.C.S. § 4501 (emphasis added).[19] However, by its terms, and with certain caveats, that definition applies only within Title 18. Outside of Section 1102, "pecuniary" appears in only one other

19. Usages of "pecuniary" are common in our Crimes Code, particularly in service of grading offenses. See, e.g., 18 Pa.C.S. §§ 3304 (grading criminal mischief by monetary damage thresholds), 3307 (same, institutional vandalism), 3309 (same, agricultural vandalism); see also 18 Pa.C.S. §§ 4958 (criminalizing an offer of "pecuniary or other benefit" to prevent the reporting of child abuse), 5108(a) ("A person commits a misdemeanor of the second degree if he accepts or agrees to accept any pecuniary benefit in consideration of refraining from reporting to law enforcement authorities the commission or suspected commission of any offense or information relating to an offense."), 5904 (proscribing, in unfortunately anachronistic terms, the "exhibit[ion] in any place, for pecuniary consideration or reward, any insane, idiotic or deformed person, or imbecile").

provision in Title 65: a party who has wrongfully sought a remedy under the Ethics Act may be liable to the subject of his action for "[a]ny specific pecuniary loss that has resulted from the proceedings." 65 Pa.C.S. § 1110(d)(3).

While the absence of a formal definition from Title 65, viewed in tandem with the express limitation of Title 18's definition to that Title, urges caution upon us in importing the latter to the former, we may nonetheless consider Section 4501's definition when delineating the common and approved meaning of "pecuniary." As noted, *supra*, nowhere in Title 18 or Title 65 does the word "pecuniary" suggest anything but a monetary benefit. Perhaps of greatest salience to this matter is 18 Pa.C.S. § 4701, which provides that a person is guilty of bribery in official and political matters, *inter alia*, "if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept . . . any pecuniary benefit as consideration for [a] decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient." 18 Pa.C.S. § 4701(a)(1). That provision, of course, is governed by the Section 4501 definition, such that bribery occurs when one offers, confers, solicits, or accepts any "[b]enefit in the form of money, property, commercial interests or anything else the primary significance of which is economic gain." Notably, Subsections 4701(a)(2) and (3) establish that bribery also may be found where "any benefit" is solicited or accepted as "consideration" for certain acts. Section 4501, in turn, defines "benefit," *simpliciter*, as follows:

Gain or advantage, or anything regarded by the beneficiary as gain or advantage, including benefit to another person or entity in whose welfare he is interested, but not an advantage promised generally to a group or class of voters as a consequence of public measures which a candidate engages to support or oppose.

18 Pa.C.S. § 4501. Consequently, it is clear not only that the General Assembly recognizes the distinction between pecuniary benefits and benefits of other kinds but also that it has chosen in the past to address the two as distinct violations within the same statutory section.

Finally, although somewhat more obliquely, our own interpretations of other aspects of the Ethics Act underscore the General Assembly's intention in that title to address *financial* conflicts of interest. In In re Carroll, for example, we observed that "[t]he intent and purpose of the Ethics Act is not shrouded in mystery." 586 Pa. 624, 896 A.2d 566, 573 (2006). Quoting Section 1101.1 of the Act, we opined that "[t]he substantive focus of this declaration is on financial interests, and particularly, how complete disclosure of financial interests may ... assure the public that the 'financial interests' of public officials 'do not conflict with the public trust.'" Id. (quoting 65 Pa.C.S. § 1101.1(a)); see Rendell v. Penna. State Ethics Comm'n, 603 Pa. 292, 983 A.2d 708, 714 (2009) ("In Carroll, this Court credited the candidate's argument that the Ethics Act, at its core, is designed to expose possible *financial conflicts* ...." (emphasis added)).

From these sources, we derive the proposition that pecuniary gain (or loss) consistently is defined in ways that imply amenability to quantification. A pecuniary benefit or detriment must be financial. While it may not be possible to come up with a to-the-dollar value of a given pecuniary benefit,[20] various statutes make clear that difficulties with precise quantification do not preclude grading of the offense by assessment of value. See generally 18 Pa.C.S. 3903(c)(1) ("Grading of theft offenses") (providing that "value means the market value of the property at the time and place of the crime, or if such cannot be satisfactorily ascertained, the cost of replacement of the property within a reasonable time after the crime"); cf. Commonwealth v. Johnson, 910 A.2d 80 (Pa. Super. 2006) (finding pecuniary benefit sufficient to establish bribery where official received sexual favors from prostitutes that would have cost $30 to $50 on the open market).

In fairness to the trial court, that court believed that its broad definition of "private pecuniary benefit" was compelled

**20.** A pecuniary gain, financial by its very definition, must be quantifiable in the broad sense we use herein, which allows for the fact that, just because something is quantifiable in principle, the quantity need not be ascertainable in precise terms in a given case to maintain its character as pecuniary.

by the Commonwealth Court's decision in Keller v. State Ethics Commission, 860 A.2d 659 (Pa. Cmwlth. 2004), which the trial court construed as holding "that private pecuniary gain (or benefit) includes the utilization of misappropriated funds to garner favorable publicity, to obtain free publicity, to enhance standing in the community, or to otherwise achieve political gain." See Trial Court Opinion, 1/23/2013, at 5. While it is true that the court in Keller considered those factors, the facts are distinguishable. At issue in Keller was a small-town mayor's solicitation of funds for performing wedding ceremonies, funds that he promised to, and ultimately did, donate to charity. Over a period of years, approximately $16,000 passed through his personal bank account, which he donated to various charities, invariably in his own name. Accordingly, while the court agreed that these donations had considerable intangible political value to the mayor, its decision nonetheless hinged upon the proposition that the mayor's receipt of the monies in question constituted a private pecuniary benefit, regardless of the funds' final destination. Accord Commonwealth v. Feese, 79 A.3d 1101, 1127 (Pa. Super. 2013) ("Whether a political party, a charity, or an individual's bank account is the ultimate recipient of the misappropriated funds and resources is irrelevant to establishing a violation of the conflict of interest provision of the Ethics Act."). Thus, Keller does not establish that intangible political benefits are sufficient to sustain a conflict of interest conviction.

After reviewing Keller, the Superior Court in the instant matter offered only the following conclusory rationale:

> [Mr.] Veon focuses on the trial court's alleged extension of the statutory term "private pecuniary gain" to include various "intangible political benefits" as improper. He argues that he received no gain whatsoever. But political gain costs money. The blatant and substantial "intangible political gain," as described in this case, constitutes private pecuniary gain—the misappropriated money [e]nured to Veon's benefit.

Veon, 109 A.3d at 765. The court followed this brief analysis with a lengthy recitation of Mr. Veon's "scheme." That account

certainly could be construed to demonstrate Mr. Veon's effort to secure political advantage. However, by itself, it does not support the proposition that "political gain costs money"; or that the General Assembly intended to establish a basis for prosecuting misuse of public monies where it is not personal receipt or retention of those monies, but rather intangible political benefit, that is sought; or that Mr. Veon's "intangible political gain" constituted in any reasonable sense a "private pecuniary benefit" as those terms commonly are understood. Thus, the Superior Court failed to set forth a rationale justifying its affirmance of the trial court's expansion of "private pecuniary benefit" to encompass "intangible political gain."

The trial court's understanding of what constitutes a "private pecuniary benefit" is unduly broad. In a recent case presenting some of the same concerns that we confront here, the Supreme Court of the United States noted that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." McDonnell v. United States, ─── U.S. ───, 136 S.Ct. 2355, 2373, 195 L.Ed.2d 639 (2016) (quoting United States v. Sun–Diamond Growers of Cal., 526 U.S. 398, 408, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999)). The trial court's jury instruction here made of the statute a meat axe, finding (or creating) a conflict of interest on every dais, at each parade, and at every ribbon-cutting, given that the very nature of seeking to satisfy one's constituents and secure re-election all but requires the taking of official action to secure intangible political gains. This criminalization of politics is a bridge too far.[21]

Our General Assembly evidently did not intend to enact such a broad proscription, and we know better than to infer

21. See United States v. Blagojevich, 794 F.3d 729, 734–39 (7th Cir. 2015) (discussing, in the context of a Hobbs Act bribery prosecution of the then–Governor of Illinois, the distinction between accepting something of value for an official act and "logrolling," the solicitation of political favors in exchange for same; observing that, for example, under an expansive interpretation, it would be criminal for a sitting governor to solicit federal funds for public works projects in exchange for appointing a particular individual to a vacant Senate seat); cf. Moran, 104 A.3d at 1147 (holding that bribery only occurs "where there is some offer of special treatment in exchange for something of value").

one in the face of more restrictive language. Based upon the plain language of Section 1102, we hold that, to prove "pecuniary benefit" as used in the conflict of interest statute, the prosecution must show some private financial gain. Consequently, the trial court erred when it instructed the jury that Section 1102 may be violated when the only benefit to Mr. Veon was political in nature. Furthermore, nothing about the remainder of the jury charge, viewed as a whole, cured the infirmity created by the trial court's erroneous statement of the law. In so erroneously and expansively interpreting Section 1102, the trial court necessarily undermined confidence in the jury's verdict to an extent requiring *vacatur* of Mr. Veon's judgment of sentence for conflict of interest.[22, 23]

## C. DCED's eligibility to receive restitution.

■ We now must determine whether the Commonwealth was eligible to receive restitution under the circumstances of this case.[24] In relevant part, 18 Pa.C.S. § 1106, "Restitution for injuries to person or property," provides as follows:

(a) **General rule.**—Upon conviction for any crime wherein property has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal

---

**22.** For reasons set forth at greater length in Section III, *infra*, this, in turn, requires us to vacate Mr. Veon's entire judgment of sentence, not just the particular sentence imposed for his conflict of interest conviction.

**23.** We express no opinion regarding the various so-called "Bonusgate" convictions for conflicts of interest that involved the deployment of state employees during business hours as campaign operatives. While there are similarities in such circumstances, there also, arguably, are differences, specifically in connection with the quantification principle. In Feese, 79 A.3d at 1121, the Superior Court held that there was sufficient evidence for a jury to conclude that Mr. Feese had sustained a private pecuniary benefit because "taxpayer[-]funded offices and equipment were used for campaign purposes," providing electoral support that otherwise would have come out of independent campaign funds or the candidate's pocket. Id. at 1121; see Commonwealth v. Veon, 1128 MDA 2014, 2015 WL 7301687 (Pa. Super. April 10, 2015) (unpublished) (same).

**24.** This, too, presents a question of law, which we review *de novo*. Robinson Twp., 83 A.3d at 943.

injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor.

\* \* \* \*

**(c) Mandatory restitution.—**

(1) The court shall order full restitution:

(i) ... so as to provide the victim with the fullest compensation for the loss. The court shall not reduce a restitution award by any amount that the victim has received from the Crime Victim's Compensation Board or other governmental agency but shall order the defendant to pay any restitution ordered for loss previously compensated by the board to the Crime Victim's Compensation Fund or other designated account when the claim involves a government agency in addition to or in place of the board. ...

(ii) If restitution to more than one person is set at the same time, the court shall set priorities of payment. However, when establishing priorities, the court shall order payment in the following order:

(A) The victim.

(B) The Crime Victim's Compensation Board.

(C) Any other government agency which has provided reimbursement to the victim as a result of the defendant's criminal conduct.

(D) Any insurance company which has provided reimbursement to the victim as a result of the defendant's criminal conduct.

\* \* \* \*

**(h) Definitions.—**As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

\* \* \* \*

**"Victim."** As defined in section 479.1 of the act of April 9, 1929 (P.L. 177, No. 175), known as The Administrative Code of 1929. The term includes the Crime Victim Compensation Fund if compensation has been paid by the

Crime Victim's Compensation Fund to the victim and any insurance company that has compensated the victim for loss under an insurance contract.

18 Pa.C.S. § 1106 (footnote omitted).

Section 479.1, formerly codified at 71 P.S. § 180–9.1, since has been recodified in the Crime Victims Act, 18 P.S. §§ 11.101, *et seq.* (the "CVA"). See Commonwealth v. Brown, 603 Pa. 31, 981 A.2d 893, 896 n.9 (2009). The CVA defines "victim" as follows:

(1) A direct victim.

(2) A *parent or legal guardian* of a child who is a direct victim, except when the parent or legal guardian of the child is the alleged offender.

(3) A *minor child* who is a material witness to any of the following crimes and offenses under 18 Pa.C.S. (relating to crimes and offenses) committed or attempted against a member of the child's family:

Chapter 25 (relating to criminal homicide).

Section 2702 (relating to aggravated assault).

Section 3121 (relating to rape).

(4) A *family member* of a homicide victim, including step-brothers or stepsisters, stepchildren, stepparents or a fiancé, one of whom is to be identified to receive communication as provided for in this act, except where the family member is the alleged offender.

18 P.S. § 11.103 (emphasis added). A "[d]irect victim" is defined by the same section as "[a]n *individual* against whom a crime has been committed or attempted and who as a direct result of the criminal act or attempt suffers *physical or mental injury, death* or the *loss of earnings* under this act." Id. (emphasis added).

In the instant matter, the Superior Court based its determination that DCED was entitled to restitution upon this Court's decision in Brown, which itself can be understood as a corrective to our earlier decision in Commonwealth v. Runion, 541 Pa. 202, 662 A.2d 617 (1995), which interpreted a previous version of Section 1106. We discuss these cases in chronologi-

cal order; together, they provide a framework for understanding Section 1106 in its present incarnation.

In Runion, we considered whether the Department of Public Welfare ("DPW"), which had covered medical expenses for a victim of a violent crime who was on public assistance at the time of the attack, was entitled to restitution under Section 1106 as it then was formulated. At that time, Section 1106 defined a "victim" as "[a]ny *person*, except an offender, who suffered injuries to his person or property as a direct result of the crime." Runion, 662 A.2d at 619 (quoting then-effective 18 Pa.C.S. § 1106(h)) (emphasis added). Nothing in the statute specified whether the Commonwealth or its agencies could qualify as a "victim." For guidance, the Court turned to the Statutory Construction Act, which then, as now, defined "person" to include "a corporation, partnership, limited liability company, business trust, other association, government entity (other than the Commonwealth), estate, trust, foundation or natural person." 1 Pa.C.S. § 1991. The Court thus found that the plain and ordinary meaning of the word "person" excluded Commonwealth agencies "where the legislature has not otherwise spoken." Runion, 662 A.2d at 619. Accordingly, DPW was not entitled to restitution.

In so ruling, however, the Court paused to bemoan the outcome, complaining that it was at odds with the historic purpose to be served by restitutionary sanctions. We noted the well-established principle "that the primary purpose of restitution is rehabilitation of the offender by impressing upon him that his criminal conduct caused the victim's loss or personal injury and that it is his responsibility to repair the loss or injury as far as possible." Id. at 618. Regarding the inexorability of our plain-language reading, however, we observed that, while the contrary interpretation "would favor the public policy of rehabilitation of an offender for an offender's criminal conduct through restitution, such a reading would not be consistent with our rules requiring a strict interpretation of penal provisions." Id. at 619. "[U]nless or until the legislature enacts language to the contrary," we concluded, "we must find that [DPW], as a Commonwealth entity, is expressly excluded

from the definition of a 'person[,'] and as such may not be considered as a victim under 18 Pa.C.S. § 1106." Id. at 621.

Notably, shortly before Runion was decided on July 18, 1995, the General Assembly revised Section 1106's definition of "victim" to the text set forth *supra*, defining such by reference to CVA Section 11.103's predecessor provision, and specifically as including the Crime Victim Compensation Fund and insurance companies where either has provided compensation to the victim of crime. See Act of May 3, 1995, P.L. 999, No. 12, § 1 (effective in 60 days), as codified by 18 Pa.C.S. § 1106(h).[25] In turn, Section 11.103 defines "victim" as set forth above. First, a victim may be a "direct victim," which is defined as an "individual" who suffers "physical or mental injury, death or the loss of earnings under this act" as a consequence of a criminal act. The remaining categories of "victim" are defined, in the only relevant particulars, as any of a "parent or legal guardian," a "minor child," or a "family member." 18 P.S. § 11.103. Thus, although the General Assembly removed the word "person" from Section 1106's definition of "victim," the Section 11.103 definition cross-referenced by Section 1106 describes only "persons" as commonly understood—"individuals" who suffered harms such as injury, death, and loss of earnings; and "parents," "guardians," "children," and "family members."

In 2009, considering Section 1106 in its current form, this Court issued its decision in Brown. In that case, the question presented was whether Medicare was entitled to share in a Section 1106 restitutionary award when it had made payments directly to a medical provider for care provided to a victim of crime. In setting a framework for our analysis, we observed that, "generally speaking, restitution is the requirement that the criminal offender repay, as a condition of his sentence, the victim or society, in money or services." Brown, 981 A.2d at 895. Echoing Runion, we emphasized that "the primary purpose of restitution is rehabilitation of the offender." Id. Conse-

---

25. Restitution was discretionary until 1998, when the General Assembly amended Section 1106 to make it mandatory. See Act of Dec. 3, 1998, P.L. 933, No. 121, § 1 (immediately effective).

quently, "recompense to the victim is only a secondary benefit, as restitution is not an award of damages," id. a proposition reinforced by the General Assembly's 1998 amendment of Section 1106 making restitution mandatory rather than discretionary. See *supra* n.25.

Turning to Section 1106, we found guidance in Subsection (c)(1)(ii), which establishes the priority order in which various categories of potential recipients will receive restitution in the event that "restitution to more than one *person* is set at the same time." 18 Pa.C.S. § 1106(c)(1)(ii) (emphasis added).[26] In order, restitution is to be paid as follows to:

(A) The victim.

(B) The Crime Victim's Compensation Board.

(C) Any other government agency which has provided reimbursement to the victim as a result of the defendant's criminal conduct.

(D) Any insurance company which has provided reimbursement to the victim as a result of the defendant's criminal conduct.

18 Pa.C.S. § 1106(c)(1)(ii). Noting that the relevant definition of "victim" did not specify any government entities except the Crime Victim's Compensation Fund, we nonetheless found a manifestation of intent to allow restitution in the General Assembly's inclusion of government agencies that have reimbursed a victim of crime in the description of the priority order for receiving restitution. However, what agencies were eligible to receive restitution, and under what circumstances, remained unclear. Consequently, we found that, in this regard, the intention reflected in Section 1106 could not be gleaned from the plain language alone, requiring the court to consider the legislative history behind Section 1106, the object to be obtained by the statute, and the consequences of the competing interpretations. Brown, 981 A.2d at 898–99.

**26.** In Brown, unlike in this case, the court sentenced the defendant to pay a portion of the mandatory restitution to a government agency and another portion to the victim directly. In this case, the restitution ordered was payable solely to DCED.

With regard to the legislative history, we reviewed our decision in Runion, in which we noted the incompatibility of our plain language interpretation with the presumptive legislative intent and the traditional objectives of restitution. We observed that, after Runion, the General Assembly's amendment of Section 1106 "expand[ed] the class of entities eligible" to receive restitution to include the Crime Victim's Compensation Fund and government agencies that had provided reimbursement to the victim, as well as insurance companies that had done the same. Id. at 899.

Having so concluded, we sought to identify the government agencies to which the expansion applied. In so doing, we focused upon the question of "reimbursement" as a necessary precondition for a government agency's entitlement to receive restitution under Subsection 1106(c)(1)(ii)(C). The question then arose whether Medicare had effectively reimbursed the victim despite the fact that it had, in fact, made payment directly to healthcare provider(s) who had treated the victim. We rejected the defendant's argument that, where a government agency makes payment to a third party, even on a victim's behalf, it falls outside the ambit of the statutory language. We emphasized that, in broadening Section 1106's coverage, "the General Assembly not only expressed an increased focus on the importance of mandatory restitution, it believed that criminal offenders should both provide restitution to the victim directly, and to entities incurring expenses on the victim's behalf." Id. at 900. Furthermore, this reading was consistent with the rehabilitative mandate that animated Section 1106. "[T]o find restitution available only to those entities which directly paid the victim would place form over substance." Id. at 901.

Finally, we turned to consider the consequences of our proffered interpretation:

> [I]nterpreting Section 1106 to embrace those government entities that indirectly provide reimbursement to a victim would serve the salutary purposes of making manifest to criminal offenders the egregious nature of their actions, impressing upon defendants that they are responsible for

their conduct, deterring repeat malfeasance, and encouraging these individuals to live in a responsible way. Furthermore, we do not believe that such an interpretation would result in the adverse consequences suggested by [the defendant] and posited by the Superior Court in [Commonwealth v. Figueroa, 456 Pa.Super. 620, 691 A.2d 487 (Pa. Super. 1997)], where restitution is transformed into a reimbursement to society. Rather, *such an interpretation is limited to those government agencies which make payments on behalf of a victim of a crime.* It is on this basis that the Superior Court below cogently distinguished its decision in Figueroa, in which the government entity provided the medical services itself, rather than a government agency that paid monies on behalf of a victim.

Brown, 981 A.2d at 901–02 (emphasis added).

Our suggestive validation of the Superior Court's decision in Figueroa warrants consideration of that case. In Figueroa, a defendant was ordered to pay restitution to the Department of Corrections for medical care administered to the victim of an assault committed by the defendant. The Superior Court held that reimbursement must be understood "in the classic sense which, by definition, is '[t]o pay back, to make restoration, to repay that expended; to indemnify, or make whole.'" Figueroa, 691 A.2d at 490 (quoting Black's Law Dictionary (5th ed.)).[27] Thus, to qualify for restitution "the governmental agency must have compensated the victim in a monetary fashion as a result of the loss of 'property [which] has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal injury directly resulting from the crime.'" Id. (quoting 18 Pa.C.S. § 1106(a)).

In enlarging the category to other government agencies that provide such compensation, the court held, "the Legislature

27. This Court adopted a similar definition of reimbursement in Commonwealth v. Garzone, 613 Pa. 481, 34 A.3d 67, 80 n.11 (2012) (adopting the definition of reimbursement from the eighth edition of Black's Law Dictionary as "[c]ompensation for loss; esp., full or partial compensation paid by a criminal to a victim ... ordered as part of a criminal sentence or as a condition of probation").

never intended to include the numerous governmental agencies [that] provide social, medical and supportive services to victims of crime. The victim is not being given *compensation* by such agencies and the agencies are not entitled to restitution as reimbursement for the service." Id. (emphasis in original). Because medical care for a prisoner is an entitlement, not compensation, such care was not reimbursable, and, consequently, could not be the subject of restitution. Rejecting the dissent's contrary analysis, the majority suggested that granting restitution in the case before it would leave courts responsible for supervising restitution to entities such as "Children and Youth Services, mental health agencies, every hospital and clinic in Pennsylvania, the Departments of Welfare, Education, and Corrections, the Department of Health and others of the more than 230 departments under state control in Pennsylvania." Id. "All of these agencies," the court noted, "in one form or another, receive state and/or federal aid and all, at one time or another, may be impacted by additional costs to [serve] a victim." Id. The court concluded that "[r]estitution was not meant to be a reimbursement system to government but a compensation system to victims identified as such in the definitional section of the statute." Id. at 491.

In any event, in Brown we relied heavily upon the implications of Subsection 1106(c)(1)(ii)'s prioritization of payment.[28] That provision is not directly implicated in this case, because the trial court directed that restitution be paid solely to DCED; absent two or more designated recipients of restitution, no priority order of payment comes into play. But that does not materially change Brown's implications for this case, because the potential recipients of restitution as to which Subsection 1106(c)(1)(ii) sets the priority order correspond

28. The Commonwealth agrees that Brown relied upon the priority order of restitution rather than the designation of DPW, itself, as a victim. The Commonwealth further agrees that no reimbursement was paid in this case, impliedly accepting that, if we must approach this case as we did Brown, no restitution will lie. However, the Commonwealth attempts to work around this difficulty by insisting that DCED is a "direct victim" for purposes of restitution. See Brief for Commonwealth at 41–43. For the reasons set forth herein, this argument cannot prevail.

directly to the potential recipients of restitution identified in Subsection 1106(c)(1)(i), which is not restricted to the multiple-payee scenario. Subsection 1106(c)(1)(i) provides for the mandatory payment of "the fullest compensation" to the victim for his loss, and provides for payment of restitution to the Crime Victim's Compensation Fund, "other designated account *when the claim involves a government agency*," and/or any insurance company, "for loss previously compensated" by those entities. 18 Pa.C.S. § 1106(c)(1)(i) (emphasis added). Under either subsection, it is clear that no restitution may be paid except to a "victim," the two categories of government entities that the General Assembly has authorized to compensate victims (when they have, in fact, done so), or victims' insurance policies for monies paid to insured victims.

Notwithstanding any legislative expansion of the definition of "victim," it is clear that the plain text of Section 11.103 still envisages "victims" as "persons" commonly understood. A "victim" under Section 11.103 must be "a direct victim," *i.e.*, an "individual" who has suffered injury, death, or loss of earnings; or a "child," "parent," "guardian," or "family member." Every relevant noun unequivocally describes a human being, not a government agency, and nowhere else is there a relevant definition that persuades us to broaden the common understanding of these words. There can be no serious doubt that DCED, the agency designated to receive the restitution ordered in this case, does not qualify as a direct victim. And neither, of course, is DCED a parent, guardian, child, or family member of a homicide victim. Although Subsection 1106(c)(1)(i)'s provisions regarding "victims" and "other government agenc[ies]" reveals that the General Assembly intended that restitution reach certain Commonwealth agencies in a manner that did not depend upon identifying such agencies as "victims," it nonetheless required first that the agency in question have provided compensation to a victim so defined. That is what necessitates our determination that DCED is not entitled to restitution in this case.

In short, to qualify for restitution under Subsection 1106(c)(1)(i), a Commonwealth agency either must be a victim as that term is used in that subsection or must have reim-

bursed a victim as defined by Section 11.103, directly or by paying a third party on behalf of the victim. DCED, itself, cannot be a victim under Section 11.103. Furthermore, DCED received no compensation from another Commonwealth agency in this case. Thus, DCED is not entitled to restitution under Section 1106.[29]

This circumstance leaves us only to reiterate the same misgivings we expressed in Runion. Denying restitution of any sort in this matter deprives the Commonwealth of a tool we have long recognized as essential, first and foremost, to the rehabilitative process. Concomitantly, those who unabashedly divert public monies to serve their own non-pecuniary interests may not be subject to the same restitutionary obligations imposed upon those who victimize individuals.

It cannot be denied that, in this case, public funds were diverted to inappropriate purposes and thus were unavailable

**29.** In her learned concurring and dissenting opinion, Justice Donohue proposes that Section 1106, as informed by Section 11.103, unambiguously authorizes restitution only for crimes that involve personal injury. Justice Donohue's Concurring and Dissenting Opinion ("DCDO") at 485–89, 150 A.3d at 462–64. However, there is nothing unambiguous about Section 1106 in this regard. Subsection 1106(a) provides that, "[u]pon conviction for *any crime* wherein property has been stolen, converted or otherwise unlawfully obtained, *or* its value substantially decreased as a direct result of the crime, *or* wherein the victim suffered personal injury directly resulting from the crime, the offender *shall* be sentenced to make restitution" (emphasis added). The General Assembly's use of this disjunctive construction strongly suggests its intention to impose restitution for property crimes *or* crimes involving personal injury, not only property crimes that happen to occur in tandem with personal injury crimes, as Justice Donohue maintains. We do not read complementary statutory provisions in isolation. Given the plain language of Subsection 1106(a), the statute read in its full context is patently ambiguous regarding whether the legislature intended to impose mandatory restitution for property crimes, as such, without regard to the occurrence of personal injury. However, Section 1106, as informed by Section 11.103, unambiguously establishes that DCED cannot be a "victim" because the relevant provisions provide that there can be no restitution when there is no human victim. Thus we need not strain to reconcile the apparent mandatory imposition of restitution for property crimes in Subsection 1106(a) with the proposition that victimhood under the statute requires a personal injury crime. That being said, Justice Donohue has identified yet another problematic aspect of the current statutory scheme governing restitution, one that the General Assembly may wish to consider in the future.

to be used in the ways intended, effectively victimizing the Commonwealth and its citizens. As a consequence of this ruling, these are monies that the Commonwealth will never recover.[30] That being said, as in Runion, to rule otherwise would require us to discard the language of the statute in pursuit of its spirit. Should the General Assembly wish to rectify this apparent gap in its restitution scheme, it may do so. We, on the other hand, may not. Accordingly, we now hold that, in this case, DCED is neither a "direct victim" nor a reimbursable compensating government agency under Section 1106.[31] Thus, it was error for the trial court in this case to order such restitution and for the Superior Court to uphold (in part) that aspect of Mr. Veon's judgment of sentence.[32]

## III. Conclusion

### A.

 Having held that the trial court committed prejudicial error in its jury charge regarding conflict of interest,

30. But see 65 Pa.C.S. § 1109(c) ("Any person who obtains financial gain from violating any provision of [Chapter 65], in addition to any other penalty provided by law, shall pay a sum of money equal to three times the amount of the financial gain resulting from such violation into the State Treasury or the treasury of the political subdivision."). We express no opinion regarding the applicability of this section under the circumstances of this case. We merely note that the General Assembly saw fit to provide a specific mechanism by which the Commonwealth might recover funds misappropriated in ways proscribed by the Ethics Act. See Commonwealth v. Gray, 6 Pa. D. & C.4th 504 (C.P. Dauphin 1989).

31. In Commonwealth v. Perzel, 116 A.3d 670 (Pa. Super. 2015), this author wrote a published opinion for a unanimous three-judge panel of the Superior Court that reached a contrary conclusion regarding restitution. In Perzel, the panel was precedentially bound by the Superior Court's prior decision in this very case, which we now reverse.

32. This ruling is not without precedent in our more recent case law. In Commonwealth v. Garzone, 613 Pa. 481, 34 A.3d 67 (2012), echoing Figueroa, we held that the compensation of Commonwealth personnel cannot be recovered as restitution under Section 1106. Although that case focused upon the recoverability of costs of prosecution under 16 P.S. § 7708, in a footnote we rejected any analogy to Section 1106, and, in so doing, rejected "the legal construct that the state, 'as the representative for society as a whole,' acts as the injured party in criminal matters." Garzone, 34 A.3d at 80 n.11 (quoting In re Hickson, 573 Pa. 127, 821 A.2d 1238, 1244 (2003)).

and that it erred in awarding restitution to DCED, we now must determine the appropriate remedy. Typically, when we determine that a trial judge has delivered an erroneous and prejudicial instruction to the jury, we vacate the defendant's judgment of sentence and remand for a new trial. See Von der Heide v. Commonwealth, Dep't of Transp., 553 Pa. 120, 718 A.2d 286 (1998) (new trial required when an instruction palpably misleads jury); Commonwealth v. Whiting, 501 Pa. 465, 462 A.2d 218 (1983) (trial court's improper expressions of opinion during jury charge required reversal of judgment of sentence and remand for new trial); Commonwealth v. Joyner, 441 Pa. 242, 272 A.2d 454, 457 (1971) (directing reversal of judgment of sentence and remanding for new trial where trial court's charge erroneously removed question of voluntariness from jury); Stegmuller v. Davis, 408 Pa. 267, 182 A.2d 745, 747 (1962) (requiring new trial where law misstated). Detecting no reason to break with these cases, we vacate Mr. Veon's judgment of sentence, and we remand for a new trial on conflict of interest or for other proceedings consistent with this opinion.[33]

33. Regardless of whether Mr. Veon raised a sufficiency challenge before the Superior Court, a proposition that is at best debatable given his occasional conclusory averments to that effect in his Superior Court brief, he has neither raised nor developed that argument before this Court. Justice Donohue nonetheless would grant Mr. Veon a full discharge with regard to his conflict of interest conviction based upon double jeopardy concerns that she apparently believes to be inherent in his challenge, since Mr. Veon indisputably has made no such argument and sought no such relief before this Court. Neither of the cases Justice Donohue cites validates such a result. In McDonnell v. United States, the Court recognized the potential for a double jeopardy argument, but the defendant specifically had raised it. Even so, the McDonnell Court remanded to the lower court to assess evidentiary sufficiency under the correct interpretation of the relevant statute rather than make that decision in the first instance on appeal, as Justice Donohue would do here. See 136 S.Ct. at 2375. And in Burks v. United States, the Court distinguished between appeals that succeeded specifically due to evidentiary insufficiency and those that succeeded based upon allegations of trial court error. See 437 U.S. 1, 13, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ("The principle that [the Double Jeopardy Clause] does not preclude the Government's retrying a defendant whose conviction is set aside because of an error in the proceedings leading to conviction is a well-established part of our constitutional jurisprudence." (internal quotation marks and emphasis omitted)).

## B.

Finally, we note that we have disturbed the sentencing scheme as to conflict of interest, which is only one of several counts for which the trial court imposed its restitutionary sentence, and have also deemed illegal the imposition of any restitutionary sanction in favor of the Commonwealth. This leaves a comprehensive sentencing scheme unmoored from its foundation, such that we must afford the trial court the opportunity to revisit its entire sentencing approach and determine what modifications, if any, are warranted in light of our ruling. See Commonwealth v. Wolfe, 636 Pa. 37, 140 A.3d 651, 663 n.7 (2016) (holding that "the entire sentencing plan must be reevaluated in instances in which a defendant [successfully] challenges one of several interdependent sentences").

Consequently, we vacate Mr. Veon's entire judgment of sentence and we remand, leaving the trial court to reconsider its entire sentencing plan.

Justice Dougherty joins the opinion. Chief Justice Saylor and Justice Donohue join the opinion with respect to Parts I,

This Court consistently has rejected the employment of a rule equivalent to Fed.R.Crim.P. 52(b), which allows federal courts to remedy "[a] plain error that affects [a defendant's] substantial rights ... even though it was not brought to the court's attention." In Pennsylvania, a defendant must preserve on peril of waiver even an issue of constitutional dimension. See Commonwealth v. Castillo, 585 Pa. 395, 888 A.2d 775, 782 (2005) ("[This] Court has abrogated the policy against enforcing waiver in the face of basic or fundamental error affecting substantive rights, ... as distinct from the practice of many other jurisdictions including the federal courts, which allow for discretionary plain error review in exceptional circumstances."); Commonwealth v. Edmondson, 553 Pa. 160, 718 A.2d 751, 752 (1998) (finding defendant waived challenge to allegedly coercive jury instruction by failing to object at trial). There are appealing arguments for applying the plain error doctrine, and a considerable number of jurisdictions have done so, but we emphatically are not among them. In effect, Justice Donohue would employ some variation on the plain error doctrine in contravention of long-standing Pennsylvania case law without the benefit of any argument in favor of such a departure from settled law. This Court may wish to revisit its current unforgiving approach to waiver. But we did not agree to do so in the instant case, and we have no lower court consideration or appellate advocacy on that issue. Accordingly, the question must await a more suitable case.

II, and III(B) except with respect to footnote 29. Justice Baer joins the opinion with respect to Part II(C). Justice Todd joins the opinion with respect to Parts I, II, and III(B).

Justice Baer files a concurring and dissenting opinion.

Justice Donohue files a concurring and dissenting opinion in which Chief Justice Saylor joins and in which Justice Todd joins with respect to Part II.

## CONCURRING AND DISSENTING OPINION

JUSTICE BAER

I join Part II.C. of the Majority opinion disposing of Appellant's restitution issue given my agreement that a Commonwealth agency cannot be a "victim," as that word is statutorily defined, entitled to mandatory restitution under 18 Pa.C.S. § 1106(a). However, for the reasons that follow, I respectfully disagree with the manner in which the Majority disposes of Appellant's issue regarding his conflict-of-interest conviction. Accordingly, I cannot join Parts II.A, II.B., or III of the Majority opinion.

I agree with the Majority's holding that "to prove 'pecuniary benefit' as used in the conflict of interest statute, [65 Pa.C.S. §§ 1102–03,[1]] the prosecution must show some private financial gain," Majority Opinion at 463, 150 A.3d at 448, and therefore, a conflict-of-interest conviction cannot be predicated on mere intangible political gain. The trial court's contrary conclusion reflects a simple misinterpretation and misapplication of a criminal statute. Appellant certainly had several avenues through which to pursue relief from this error. For instance, Appellant could have challenged the trial court's incorrect definition of an element of the crime by objecting to the jury instruction containing the improper definition. He also could have raised an insufficiency of the evidence chal-

1. Section 1103 provides that "[n]o public official ... shall engage in conduct that constitutes a conflict of interest." 65 Pa.C.S. § 1103. The immediately preceding section defines conflict of interest as "[u]se by a public official ... of the authority of his office ... for the private pecuniary benefit of himself ...." 65 Pa.C.S. § 1102.

lenge in the Superior Court. Both of these challenges present clear standards of review and straightforward avenues for relief. If we determined that the trial court abused its discretion by improperly instructing the jury, then Appellant would be entitled to a new trial. If we determined that there was insufficient evidence to support the conviction, then Appellant would be entitled to an acquittal.

However, the only question Appellant has presented throughout this litigation, including in his petition seeking this Court's review, is a convoluted constitutional challenge, which makes no mention of any jury instruction. The Majority goes to great lengths to explain why it can address Appellant's constitutionally-framed issue as one challenging an erroneous jury instruction, despite Appellant's focus on what he repeatedly self-describes, and the Majority recognizes, as a constitutional challenge. See Maj. Op. at 454–56, 150 A.3d at 443–44 (Part II.A "Concerning the constitutional question"). Moreover, and dispositively, the Majority does not point to where Appellant specifically objected to the erroneous jury instruction. See Pa.R.Crim.P. 647(C) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate."); Commonwealth v. Gwynn, 555 Pa. 86, 723 A.2d 143, 152 (1998) ("A defendant's failure to challenge the jury charge before the jury retires to deliberate prevents appellate review.").

I can appreciate the Majority's inclination to correct a clear trial court error. However, we can only grant relief based on preserved issues that are argued and developed by the parties. See, e.g., Dilliplaine v. Lehigh Valley Trust Co., 457 Pa. 255, 322 A.2d 114, 117 (1974) (abolishing the fundamental error theory as a basis for reviewing jury instructions to which the appellant had not objected). In my view, Appellant's constitutional framing of his issue is a wholly inapt vehicle by which to challenge his conflict-of-interest conviction. Rather than act as Appellant's advocate and reinvent his arguments, I would find that his failure to present the proper challenge constitutes

waiver precluding this Court from granting him relief.[2] Thus, I find myself constrained to affirm Appellant's conviction for conflict-of-interest.

For these reasons, I would vacate the Superior Court's order and Appellant's judgment of sentence and remand for resentencing based on the trial court's erroneous grant of restitution to a Commonwealth agency.

## CONCURRING AND DISSENTING OPINION

JUSTICE DONOHUE

### I. Statutory Interpretation

I join the Majority in its conclusion that to constitute a conflict of interest as defined in 65 Pa.C.S.A. § 1102, the "private pecuniary benefit" must consist of a monetary gain. Having concluded that the trial court improperly expanded the definition of a conflict of interest to include "intangible political gain," I further agree that there is no basis to engage in an analysis of whether section 1103, which prohibits a public official or public employee from engaging in conduct that constitutes a conflict of interest, was unconstitutional as applied in this case. See Mt. Lebanon v. Cnty. Bd. of Elections, 470 Pa. 317, 368 A.2d 648, 650 (1977) ("we should not decide a constitutional question unless absolutely required to do so"); 65 Pa.C.S.A. § 1103(a).

A decision finding that a statutory provision is unconstitutional as applied is based upon a conclusion that the law, as written, cannot be constitutionally applied to a party under particular circumstances. See, e.g., In re J.B., 630 Pa. 408, 107 A.3d 1, 20 (2014); Clifton v. Allegheny Cty., 600 Pa. 662, 969 A.2d 1197, 1229 (2009); Nixon v. Commonwealth, 576 Pa. 385, 839 A.2d 277, 286–90 (2003). The as-applied challenge posed by

2. Interestingly, the Majority recognizes that "[Appellant] has not preserved any claim regarding the sufficiency of the evidence," Maj. Op. at 474 n.32, 150 A.3d at 455 n.32, and thus "we will not pass upon the question of evidentiary sufficiency." Id. I agree. However, the Majority provides no persuasive explanation for its inconsistent application of the waiver doctrine, as a challenge to Appellant's jury instructions is just as waived as a challenge to the sufficiency of the evidence.

Veon arises as a consequence of the trial court's expanded definition of "private pecuniary interest." In this sense, Veon's contention is more aptly expressed as a claim that the statute is "unconstitutional as interpreted" rather than "unconstitutional as applied."

As the question is presented and as a matter of law, we necessarily must address, at the outset, whether the courts below properly interpreted the provision at issue. I therefore agree with the learned Majority that our conclusion that the courts below erred in their interpretation of the statute's plain text obviates the constitutional question.

## II. Remand for Retrial

We are thus left with a crime that cannot be committed unless there is a private pecuniary benefit, i.e., a financial gain. As the Majority observes, this has always been the correct interpretation of the conflict of interest statute; the plain language of the statute bespeaks of no other definition. The Majority nonetheless declines to review the sufficiency of the evidence to support a private financial gain, maintaining that Veon waived consideration of this claim by failing to raise the argument before this Court or request discharge in his prayer for relief. Majority Op. at 475–76 n.33, 150 A.3d at 456 n.33. I respectfully disagree with each premise for finding waiver. In his brief before this Court, Veon challenges the sufficiency of the evidence to support his conflict of interest conviction—specifically as it relates to evidence of a private pecuniary gain—as part of his broader statutory interpretation claim.[1] Veon asserts that there was "no evidence of record" to support a finding that he received a private pecuni-

1. Veon raised the same challenge in the same manner before the Superior Court. *See* Veon's Superior Court Brief at 26–27, 29 (arguing that the trial court improperly permitted the expansion of the conflict of interest statute to include "intangible political benefits," and that there was no evidence presented that Veon or his family experienced any monetary gain as a result of his actions). Because the Superior Court found that the trial court did not impermissibly expand the conflict of interest statute to include intangible political benefits, it did not need to reach the question of whether the evidence was insufficient to establish that Veon received any monetary gain from his conduct.

ary gain because of his actions, as the "nature of the prosecution" did not involve a financial gain at all; rather, his prosecution for conflict of interest was based solely upon "intangible gains" that Veon experienced in the form of "favorable publicity and free publicity and enhance[d] standing in the community so that he can continue to be reelected." Veon's Brief at 8, 10–11, 21–23 (quoting, in part, the Commonwealth's closing argument, N.T., 3/1/2012, at 74); see also id. at 25 ("This case was not about Mr. Veon taking money. It was not about him using a non-profit as his personal bank account. It was not about misappropriation of funds. It was about allowing the jury to speculate on intangible political benefits that were never proven in order to meet a statutory requirement of pecuniary gain."). In my view, under the particular circumstances of this case and because of the nature of the issues subject to our review, the sufficiency claim did not need to be raised as a standalone issue, as it is raised within and encompassed by the statutory interpretation question.[2]

Further, Veon's failure to specifically request discharge in his prayer for relief in no way impedes our ability to grant this relief if we conclude it is appropriate. In a case that likewise involved double jeopardy concerns, the United States Supreme Court made clear that in determining the proper resolution of an appeal, courts are not limited by the remedy requested by the appellant. Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ("[I]t makes no difference that a defendant sought a new trial as one of his remedies, or even as the sole remedy. It cannot be meaningfully said that a person 'waives' his right to a judgment of acquittal by moving for a new trial.").

I therefore disagree with the esteemed Majority that remand for retrial on the conflict of interest charge is the appropriate outcome here. Instead, drawing upon the teach-

2. Thus, contrary to the Majority's accusation, I do not invoke the plain error doctrine to decide that the evidence was insufficient to support Veon's conflict of interest conviction. See Majority Op. at 475–76 n. 33, 150 A.3d at 456 n. 33. Rather, as discussed, my review of the record and Veon's brief before this Court reveal that he has adequately preserved and presented the argument within his statutory construction claim.

ings of the United States Supreme Court in McDonnell v. United States, — U.S. ——, 136 S.Ct. 2355, 195 L.Ed.2d 639 (2016), I would conclude that the conflict of interest charge against Veon should be dismissed at this level.

Like the case at bar, McDonnell involved a question of statutory construction; specifically, the definition of the phrase "official act" required for convictions of honest services fraud and Hobbs Act extortion charges. *See* id. at 2361, 2365. As reflected by the United States Supreme Court's lengthy explanation of the precise meaning of the phrase, *see* id. at 2368–71, the language of the statute defining "official act" was, in part, ambiguous and subject to multiple interpretations, requiring the McDonnell Court to "choose between ... competing definitions[.]" Id. at 2368. Based upon (1) its novel interpretation of what constitutes an "official act," (2) the fact that the parties had not had the opportunity to brief the question of whether the defendant's actions constituted an "official act" under that new definition, and (3) its conclusion that the evidence presented at trial was susceptible to competing interpretations, the McDonnell Court found that remand was appropriate for the Court of Appeals to determine, in the first instance, whether the evidence was sufficient to convict the defendant of committing or agreeing to commit an official act (per the new definition), thereby warranting retrial. Id. at 2375. In remanding the case, however, the Court included an unequivocal mandate: if the court below found there was insufficient evidence presented at the original trial that the defendant committed or agreed to commit an "official act" as now defined, "the charges against him must be dismissed." Id.

In contrast, in this case, the Majority's vacatur of Veon's conflict of interest conviction is premised upon its conclusion that the Commonwealth and the trial court misinterpreted the clear and unambiguous meaning of the phrase "private pecuniary benefit" contained in section 1102. *See* Majority Op. at 462, 150 A.3d at 447. No detailed statutory interpretation was required, as the words of the statute supported only one definition. *See* Barasch v. Pennsylvania Pub. Util. Comm'n, 516 Pa. 142, 532 A.2d 325, 331 (1987) ("where the words of a

statute are clear and free from ambiguity, a court may go no further"); 1 Pa.C.S.A. § 1921(b). Nor are we announcing a new definition of "private pecuniary benefit." To the contrary, the Majority reached its conclusion based upon "the plain language of [s]ection 1102." Majority Op. at 462–63, 150 A.3d at 447–48.

To prove that Veon engaged in a conflict of interest, the Commonwealth was required to prove that (1) Veon, as a public official or public employee, (2) used the authority of his office or employment or confidential information (3) to obtain a private pecuniary benefit for himself, a member of his immediate family or a business with which he or his immediate family member is associated, and (4) the economic impact was more than de minimus. 65 Pa.C.S.A. §§ 1102, 1103(a). The jury convicted Veon, at count one, of engaging in a conflict of interest, which charge was based upon Veon improperly diverting money from Beaver Initiative for Growth ("BIG") to make payments related to his legislative offices.[3] *See* Criminal Information at 1; Trial Court Order, 3/5/2012. Throughout the entire case—from the charging document through closing arguments (and continuing on appeal)—the Commonwealth contended that the "private pecuniary benefit" that Veon received was the political benefit that flowed from his actions. The Commonwealth adduced no evidence that Veon obtained any private pecuniary benefit through the actions alleged.

3. Specifically, the Commonwealth charged Veon, at count one, as follows:

On or about divers dates in and between 2003 and 2006, the [a]ctor, Michael R. Veon, a public official or public employee, engaged in conduct that constitutes a conflict of interest by using the authority of his office for his own private pecuniary benefit; namely, the actor, while employed as a State Representative by the Commonwealth of Pennsylvania, authorized, directed and/or approved the payment of public funds in the form of [BIG] grant monies for the payment of rent of a legislative district office, and/or the payment to Terry Van Horne for [BIG] work never performed, and/or the payment of the rent of a South Side Pittsburgh office and/or the payment of a monthly retainer to Jeff Foreman as a personal favor and/or as compensation for legislative and/or political work, thereby committing the offense of [c]onflict of [i]nterest[.]

Criminal Information at 1. The jury acquitted Veon of the second conflict of interest charge, which related to allegations that Veon authorized funds to be paid from BIG to Delta Development to secure a higher salary for his brother. *See* id.; Trial Court Order, 3/5/2012.

When viewed in the context of how this case was charged and tried by the Commonwealth, the Majority's decision to limit its discussion to the jury instruction defining private pecuniary benefit is, in my view, a myopic basis for the decision of this matter.[4] As stated herein, and argued by Veon at every level, the entire premise of the Commonwealth's case was that Veon received intangible political benefits from his actions, and the receipt of intangible political benefits satisfies the element of private pecuniary gain to constitute a conflict of interest. There was never an allegation nor any evidence presented that Veon or his family members received a financial benefit from his use of BIG money to pay the rent for his legislative offices. To the contrary, the Commonwealth forcefully argued to the jury that a conflict of interest was "not limited to money," and that Veon was guilty of the crime because of his receipt of "intangible benefits" including "garnering favorable publicity and free publicity and enhancing his standing in the community so he can continue to be reelected." N.T., 3/1/2012, at 74.

Simply put, because of its erroneous interpretation of the statute, the Commonwealth failed to establish a material element of the crime of conflict of interest. As there is no question that the evidence was insufficient to sustain his conflict of interest conviction, the charge "**must** be dismissed." McDonnell, 136 S.Ct. at 2375 (emphasis added); *see also* Commonwealth v. Arrington, 624 Pa. 506, 86 A.3d 831, 840 (2014) (stating that evidence is sufficient if it supports a conclusion that the Commonwealth proved every element of the offense beyond a reasonable doubt); *cf.* Burks, 437 U.S. at 11, 98 S.Ct. 2141 ("The Double Jeopardy Clause precludes a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding."). Thus, I would vacate the

4. Notably, like his sufficiency claim, Veon raises his challenge to the jury instruction within his statutory interpretation claim and not as a standalone issue for this Court's review. I agree with the Majority that the jury instruction in question was erroneous, and his objection thereto was preserved before the trial court. *See* N.T., 03/01/2012, at 50–51.

judgment of sentence and dismiss the conflict of interest charge.[5]

## III. Restitution

Turning to the propriety of the restitution award, I agree with the Majority that the Department of Community and Economic Development (the "DCED") is not entitled to restitution pursuant to 18 Pa.C.S.A. § 1106. My review of the statutory language, however, reveals a more fundamental problem than the fact that the DCED is not a person, see Majority Op. at 471–72, 150 A.3d at 453, as the Legislature has made no provision for restitution for crimes that only result in a loss of property or money.

In arriving at its conclusion, the Majority relies upon the definition of "victim" in section 1106 of the Crimes Code and section 11.103 of the Crime Victims Act,[6] the "mandatory restitution" requirement of section 1106(c)(1), and our prior decisions in Commonwealth v. Brown, 603 Pa. 31, 981 A.2d 893 (2009), and Commonwealth v. Runion, 541 Pa. 202, 662 A.2d 617 (1995), both of which interpreted the law to determine whether a Commonwealth agency is entitled to restitution for medical payments made on behalf of a victim of simple assault, a crime involving personal injuries. See Majority Op. at 465–73, 150 A.3d at 449–55. However, the substance of the restitu-

5. Veon has not challenged his conviction under the conflict of interest statute on any grounds other than his failure to receive any private pecuniary gain. Thus, we were not asked to determine whether, when authorizing or directing the payment of the funds at issue, Veon was acting as a public official or public employee as those terms are defined in the Public Official and Employee Ethics Act, 65 Pa.C.S.A. § 1102. I note, however, that although Veon was a State Representative at the time of the conduct at issue, he did not use the "authority of his office," as required to constitute a conflict of interest, to divert the funds from BIG to his legislative offices. Veon's role as a member of the House of Representatives did not give him any right to access BIG's funds. Rather, it was his role as the co-chair of BIG, a private nonprofit corporation, that permitted the expenditure of the funds.

6. The definition of "victim" in section 1106(h) refers to the definition of "victim" contained in now-repealed section 180-9.1 of the Administrative Code of 1929. See 18 Pa.C.S.A. § 1106(h). When the Legislature repealed sections 180-9 to 180-9.11, it expressly recodified the repealed provisions with the statutory provisions of the Crime Victims Act. 18 P.S. § 11.5102; see also S.B. 1192, Act 1998-111, Reg. Sess. (Pa. 1998).

tion statute, including the provisions upon which the Majority relies and the case law it discusses, all relate solely to victims of personal injury crimes.

As the Majority recognizes, section 1106(h) defines "victim" by incorporating the definition of "victim" contained in section 11.103 of the Crime Victims Act.[7] 18 Pa.C.S.A. § 1106(h). Section 11.103 includes the following relevant definitions:

**"Direct victim."** An individual against whom a crime has been committed or attempted **and who as a direct result of the criminal act or attempt suffers physical or mental injury, death or the loss of earnings under this act.** The term shall not include the alleged offender. The term includes a resident of this Commonwealth against whom an act has been committed or attempted which otherwise would constitute a crime as defined in this act but for its occurrence in a location other than this Commonwealth and for which the individual would otherwise be compensated by the crime victim compensation program of the location where the act occurred but for the ineligibility of such program under the provisions of the Victims of Crime Act of 1984 (Public Law 98–473, 42 U.S.C. § 10601 et seq.).

\* \* \*

**"Victim."** The term means the following:

(1) **A direct victim.**

(2) A parent or legal guardian of a child who is a direct victim, except when the parent or legal guardian of the child is the alleged offender.

(3) A minor child who is a material witness to any of the following crimes and offenses under 18 Pa.C.S. (relating to crimes and offenses) committed or attempted against a member of the child's family:

Chapter 25 (relating to criminal homicide).

Section 2702 (relating to aggravated assault).

---

**7.** Within its definition of "victim," subsection (h) also "includes the Crime Victim's Compensation Fund if compensation has been paid by the Crime Victim's Compensation Fund to the victim and any insurance company that has compensated the victim for loss under an insurance contract." 18 Pa.C.S.A. § 1106(h).

Section 3121 (relating to rape).

(4) A family member of a homicide victim, including step-brothers or stepsisters, stepchildren, stepparents or a fiance, one of whom is to be identified to receive communication as provided for in this act, except where the family member is the alleged offender.

18 P.S. § 11.103 (emphasis added).

As the above-quoted definitions make clear, a "victim," as that term is defined by the Crime Victim's Act, only exists in situations where the result of the crime is death, injury, or a loss of earnings. It follows that the victim of a property crime that does not have such a result is not a "victim" for purposes of section 11.103 and, by extension, section 1106.

I note that section 1106(a), which sets forth the general rule regarding restitution, states:

**Upon conviction for any crime wherein property has been stolen, converted or otherwise unlawfully obtained,** or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal injury directly resulting from the crime, **the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor.**

18 Pa.C.S.A. § 1106(a) (emphasis added). Although, at first glance, this suggests that a court must sentence an offender to make restitution for any and all theft-related crimes, further review of section 1106 reveals that the words "property" and "restitution" are both defined terms that expressly apply only to a "victim." The statute defines "property" as "[a]ny real or personal property including currency and negotiable instruments, of **the victim.**" 18 Pa.C.S.A. 1106(h) (emphasis added). It defines "restitution" as "[t]he return of the property of **the victim** or payments in cash or the equivalent thereof pursuant to an order of the court." Id. (emphasis added). Thus, pursuant to section 1106(a), the victim of a theft is only entitled to restitution if he or she died, was injured or suffered a loss of earnings as a result of the theft. While we presume the General Assembly did not intend a result that is absurd or

incapable of execution, *see* 1 Pa.C.S.A. § 1922(1), we are prohibited from disregarding the plain language of a statute "under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b).

Section 1106, as it is currently written, has no provision requiring or permitting restitution for a crime where the victim suffers only a loss of money or property, regardless of whether the victim is a government agency or a person.[8] We are bound by the plain language of the current statute, which clearly and unambiguously requires restitution to be paid only to a "victim" as defined by section 11.103.[9] As we have

**8.** It is obvious that a legislative remedy for this appreciable gap in the statute is necessary. That being said, the Legislature, by its definitions, excluded restitution in these instances.

It is worth noting that the prior definition of "victim," contained in 71 P.S. § 180–9.1, accounted for restitution payable to the victim of a theft-related crime, but the DCED would not have been entitled to restitution. Section 180–9.1 defined "victim," in relevant part, as: "A **person** against whom a crime is being or has been perpetrated or attempted." 71 P.S. § 180–9.1 (repealed Nov. 24, 1998) (emphasis added). Section 1991 of the Statutory Construction Act defines "person" as "a corporation, partnership, limited liability company, business trust, other association, government entity **(other than the Commonwealth)**, estate, trust, foundation or natural person." 1 Pa.C.S.A. § 1991 (emphasis added). The General Assembly, however, expressly disavowed its adherence to this definition of "victim" when it passed the Crime Victims Act.

**9.** The Majority suggests that the language of subsection (a) that requires restitution for "any crime wherein property has been stolen," combined with the definition of "victim" adopted in subsection (h), renders section 1106 ambiguous with regard to whether restitution can be required in relation to property crimes that do not result in personal injury. *See* Majority Op. at 473 n.29, 150 A.3d at 454 n.29. This Court has stated, however, that an ambiguity only exists where there are at least two reasonable interpretations of the statutory text under review. *See* Del. Cnty. v. First Union Corp., 605 Pa. 547, 992 A.2d 112, 118 (2010). Although an undeniable tension arises in light of the universal directive of section 1106(a) and the limited definition of "victim" contained in section 11.103 (adopted in section 1106(h)), in my view, this tension does not stem from an ambiguity. It is unreasonable to read sections 1106(a) and 1106(h) together as permitting restitution where no victim, as expressly defined by section 11.103, exists. *See generally* Majority Op. at 464–65, 150 A.3d at 449 (stating that section 11.103's definition of victim applies in the context of section 1106). Rather, in my view, the tension stems from a legislative oversight in failing to broaden the definition of "victim"—an oversight that would be improp-

repeatedly held, "restitution is a creature of statute and, without express legislative direction, a court is powerless to direct a defendant to make restitution as part of a sentence." Commonwealth v. Harner, 533 Pa. 14, 617 A.2d 702, 704 (1992) (citing Commonwealth v. Walton, 483 Pa. 588, 397 A.2d 1179 (1979)). Because Veon was not convicted of any personal injury-related crimes, the trial court was not empowered to order that he pay restitution to anyone, including the DCED.

## IV. Conclusion

For the foregoing reasons, I join sections I, II(A) and II(B) of the Majority Opinion. I join section II(C) of the Majority Opinion (with the exception of footnote 29) and its finding that the DCED is not entitled to restitution, subject to my additional analysis of the restitution statute. I respectfully dissent from the Majority's determination, contained in section III(A), that Veon may be retried on the conflict of interest charge, but join the Majority's conclusion, contained in section III(B), that we must remand the matter for resentencing.

Chief Justice Saylor joins this concurring and dissenting opinion.

Justice Todd joins this concurring and dissenting opinion with respect to Part II.

er for this Court to cure via statutory construction. *See* Burke v. Independence Blue Cross, 628 Pa. 147, 103 A.3d 1267, 1273–74 (2014) (concluding that the statutory text "reveals, not an ambiguity, but an asymmetry stemming from an apparent legislative oversight").