IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John P. Sivick,                            :
                    Petitioner             :
                                           :
          v.                               :
                                           :
Commonwealth of Pennsylvania,              :
State Ethics Commission,                   :   No. 307 C.D. 2021
                    Respondent             :   Argued:  October 18, 2021


BEFORE:   HONORABLE P. KEVIN BROBSON, President Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                FILED:  December 22, 2021


          John P. Sivick (Sivick) petitions this Court for review of the
Commonwealth of Pennsylvania (Commonwealth) State Ethics Commission's
(Commission) February 3, 2021 final adjudication and order (Adjudication After
Remand),[1] wherein the Commission concluded that Sivick violated Section 1103(a)
of the Public Official and Employee Ethics Act[2] (Ethics Act), Section 1104(d) of the
Ethics Act,[3] and Section 1105(a) and 1105(b)(5) of the Ethics Act,[4] ordered Sivick
to file complete and accurate amended Statements of Financial Interests (SFI) for
2011 and 2014, and directed that the matter be referred to the Pike County (County)
District Attorney and the Pennsylvania Attorney General with the Commission's
recommendation that criminal prosecutions be initiated against Sivick.  On appeal,

---

[1] The order is Commission order number 1731-2, mailed on February 25, 2021.

[2] 65 Pa.C.S. § 1103(a).

[3] 65 Pa.C.S. § 1104(d).

[4] 65 Pa.C.S. § 1105(a), (b)(5).

Sivick presents one issue for this Court's review: whether the Commission erroneously concluded that Sivick committed conflict of interest violations under Section 1103(a) of the Ethics Act relative to activities Sivick undertook before Lehman Township[5] (Township) hired his son, J. Justin Sivick (Son). After review, this Court affirms.[6]

The Township is a second class township with a three-member Board of Supervisors (Board). *Sivick served as a Supervisor on the Board* (Supervisor) *from January 1994 until December 2017*, *and as Board Chairman since 2004*. Sivick has also held the Township's full-time Roadmaster position since 1995. In 2005, the Board assigned Sivick the additional responsibilities of Public Works Director. Other Supervisors during the subject time periods included Richard C. Vollmer (Vollmer), Paul D. Menditto (Menditto), and Robert H. Rohner (Rohner). Vollmer became a Supervisor on July 5, 2000, and, at the time of the Commission's proceeding, was serving his third term.[7] Vollmer has been Board Vice Chairman since January 2004. Menditto served as a Supervisor from January 2004 through January 2014, when he resigned his position following his election as a Magisterial District Judge. Rohner, who had been Township Secretary/Treasurer since 1995, became a Supervisor in January 2014, replacing Menditto on the Board.

In 2009, during his time as Supervisor, Menditto substantially upgraded the Township's existing three-page employee pamphlet to an employee handbook (Handbook), which included detailed rules and regulations, and contained a policy that prohibited the hiring of an individual if that person would supervise or be

---

[5] Lehman Township is located in Pike County, Pennsylvania.

[6] References herein to witness testimony are, in fact, references to deposition testimony that, pursuant to the parties' stipulations, would have been presented to the Commission, under oath, had a hearing been held.

[7] *See* Section 403 of The Second Class Township Code, Act of May 1, 1933, P.L. 103, *as amended*, added by Section 1 of the Act of November 9, 1995, P.L. 350, 53 P.S. § 65403.

supervised by a member of the person's immediate family (Nepotism Policy).[8]  The Board approved the Handbook, which included the Nepotism Policy.

The Township did not have a formal hiring process, and Sivick conducted all of the Township's hiring.  In late 2012, *Sivick verbally expressed to his fellow Supervisors in one-on-one, unadvertised meetings, that he wanted the Township to employ his Son*.  During these conversations, Sivick and the other Supervisors acknowledged that the Nepotism Policy would need to be removed from the Handbook before his Son could be hired.[9]  Shortly thereafter, Menditto, in consultation with the Supervisors, including Sivick, revised the Handbook to remove the Nepotism Policy.

---

[8] The Nepotism Policy defined "immediate family" as "one's spouse, parent, son or daughter, sister or brother, grandparent or grandchild."  Reproduced Record (R.R.) at 94a-95a.

[9] Rohner testified that, in the fall of 2012, Sivick told him: "I want to hire my [S]on, [so] we need to change the [Handbook]."  R.R. at 127a**.  Rohner opined that Sivick did not present the Handbook change and hiring of his Son as a suggestion**, **but rather as a directive**.  *See* R.R. at 128a.  Rohner stated: "If you know [Sivick], that's how it goes."  *Id*.  "Rohner [explained] that . . . **Sivick was the Township Supervisor who primarily ran things at the Township**, **and if he wanted things done**[,] **they got done**."  Commission Adjudication (February 25, 2021 Order 1731-2) at 11, ¶ 33(b)(1) (emphasis added).  Vollmer testified:

> In late 2012, [Sivick] came and he said[,] . . . "I'd like to somebody [sic] maybe have my [S]on work here" . . . also in our [H]andbook we have a thing about hiring employees you know like relatives and . . . I questioned him on it.  I said look, I said "do you really think that's a good idea?"  I said "because a lot of time you know a father can't work with his son."  Now I don't [sic] know [Son] at this time.  So [Sivick] proceeds to tell me that in the past there have been [S]upervisors who had their families working in there etc.  And I know this is true . . . [.]  But anyway that wasn't the reason so I asked him.  I said "are you absolutely sure?"  I said you know.  So he talked it up and I said [sic] and I had mixed emotions[,] I really did.  I was one way or the other and I said alright look I said "but you know it's in the [Handbook] and all" and he said ["]we[]ll we're going to have to change the [Handbook] then."  So anyway I agreed[.]  I said okay we'll change the [Handbook].

R.R. at 156a-157a.

3

On January 7, 2013, at a Township reorganizational meeting, Menditto moved the Board to approve the "employee benefits and information[,]" that included the revised Handbook without the Nepotism Policy. Reproduced Record (R.R.) at 190a. Vollmer seconded Menditto's motion, and it was approved. Although present at the meeting, Sivick abstained from voting on the revision, as instructed by the Township's Solicitor. Despite the Board's general practice of preparing an errata sheet reflecting Handbook changes, **Sivick told Menditto not to prepare an errata sheet**, **and no errata sheet was created**.[10] The meeting minutes do not reflect that the Nepotism Policy was removed. Rather, the minutes reference the Supervisors approving "the employee benefits and information[,]" and further document that Sivick abstained from that vote. R.R. at 190a.

As Roadmaster, Sivick coordinated and scheduled training classes for Township road crew employees. On March 20, 2013, Rohner submitted a registration form on the Township's behalf enrolling six individuals in a traffic control flagger training course that the Pennsylvania Department of Transportation

---

[10] Menditto described the usual process used for implementing changes to the Handbook:

> The Supervisors would discuss what change they wanted to make[,] and then I would make the changes and[,] under most circumstances[,] I would then develop a[n] errata sheet that would say here's what's changed[,] and I would give out the new [H]andbook or the revised [H]andbook along with the errata sheet to the employees . . . and I would have them sign for it so . . . everybody knew, they didn't have to look through the whole book to see what changed.

R.R. at 140a. Menditto recounted that, with respect to the Nepotism Policy's removal: "[T]**hat process was different**. Again the Supervisors did discuss it, it was agreed that [the Nepotism Policy] would come out[,] along with other minor changes that might have taken place in the [Hand]book at that point. **But I was told** [**by Sivick**] **not to make an errata sheet**." R.R. at 141a (emphasis added). When asked if Sivick explained his reason for directing that no errata sheet be made, Menditto stated: "I think it was obvious. I don't remember him telling me why but I think it was obvious. . . . [H]e didn't want people seeing that we were taking the [N]epotism [Policy] out of the [Hand]book." R.R. at 141a.

mandated for individuals with flagging duties. **Although Sivick's Son had not yet applied for Township employment**, **his name was among those included in the Township's flagger course enrollment form**. The Township submitted a $300.00 payment, reflecting a $50.00 enrollment fee for each of the six registered enrollees. On the same date, Sivick issued a $50.00 check to the Township wherein the memo line read: "Flagging Class." R.R. at 172a.

On June 3, 2013, Son applied for Township employment in public works maintenance.[11] In early June 2013, Sivick again approached the Supervisors about hiring his Son. Although both Vollmer and Menditto admitted that they voted to approve Son's employment at a June 2013 meeting,[12] the June 2013 Township **meeting minutes do not reflect an official Board vote approving Son's hiring**.

Sivick's Son began employment on the Township's road crew on June 10, 2013. His initial pay rate was $15.00 per hour for regular work hours and $22.50 per hour for overtime hours. His starting pay rate was consistent with pay rates for new Township employees. In 2014, Son's regular pay rate was $16.20 per hour and his overtime rate was $24.30 per hour. In 2015, his regular pay rate was $17.45 per hour and his overtime rate was $26.18 per hour. In 2016, his regular pay rate was $18.20 per hour and his overtime rate was $27.30 per hour.

---

[11] Son checked a box on the employment application to indicate that he had a relative employed by the Township, but did not provide information requested therein to identify the relative, the relative's relationship to him, or the relative's position with the Township.

[12] According to Menditto, during the time Menditto served as a Township Supervisor, Sivick did all of the hiring and there was no formal hiring process at the Township. Menditto testified: "I don't recall ever being asked an opinion on whether we should hire a certain person or not." R.R. at 143a. He further stated that the Board did not ordinarily vote on hiring, and the vote to hire Son was not recorded in the meeting minutes. Adjudication After Remand at 11, Finding of Fact 34(d), (f). Record evidence reflects that Son was the only Township employee hired by a Board vote. Rohner testified that, although Vollmer and Menditto officially moved to hire Son, "[Sivick] was the one who wanted him hired." R.R. at 125a.

5

The Township employed Son for 81 pay periods from June 2, 2013, to July 9, 2016, during which time his gross earnings totaled $126,552.24 (his net earnings totaled $87,949.36). The Township terminated Son's employment on June 30, 2016.

On November 15, 2015, the Commission's Investigative Division (Investigative Division) received a signed, sworn complaint, wherein it was alleged that Sivick had violated the Ethics Act. On January 19, 2016, the Investigative Division initiated a preliminary inquiry and, thereafter, a full investigation, and notified Sivick accordingly.[13] On September 13, 2016, the Investigative Division

---

[13] In his brief, Sivick cites to and relies upon statements contained in a February 3, 2016 Investigative Division Report of Interview prepared by Joseph Sherbaum (Sherbaum) regarding his interview of Rohner that day. Sherbaum's February 3, 2016 report provides, in relevant part:

> Rohner stated that [Sivick] had asked Vollmer and Menditto to hire [his Son]. Rohner stated that [Sivick], Vollmer, and Menditto had told Rohner that "they were going to change the employee [Handbook] to take out the [N]epotism [P]olicy." Rohner stated that those statements had occurred in Rohner's office at the Township building. Rohner stated that those statements had occurred multiple times and that Rohner had replied to them: "[I]t would be nothing but trouble if they did that."
>
> **Rohner stated that there was never an advertisement or job announcement for the full-time position that** [Son] **obtained at the Township**. . . . Rohner stated that **there were no other candidates for that road crew position**.
>
> Rohner stated that he did not personally witness [Sivick] intimidating the other Supervisors into hiring [his Son]. Rohner stated that Menditto had struggled with the decision to hire [Son].

R.R. at 100a (emphasis added).

Notably, according to a February 8, 2016 Investigative Division Report of Interview, **Rohner called Sherbaum after his February 3, 2016 interview**. Sherbaum's February 8, 2016 report explains:

> I had sensed that **Rohner had not been as forthcoming with information** . . . **and that Rohner seemed to be uneasy due to the presence of** [**Township**] **Solicitor, Robert Bernathy**, at said interview. After that interview, I had told Rohner that he may call

6

mailed Sivick an Investigative Complaint/Findings Report, in response to which Sivick filed an answer on November 12, 2016. The parties filed a Stipulated Record in lieu of an evidentiary hearing and filed briefs.

On February 1, 2018, the Commission issued its final adjudication (First Final Adjudication), wherein it determined that Sivick violated the conflict of interest provisions of Section 1103(a) of the Ethics Act, that Sivick filed timely but deficient SFIs for calendar years 2011 and 2014 in violation of Section 1105(a) and 1105(b)(5) of the Ethics Act, and that Sivick violated Section 1104(d) of the Ethics Act because he received compensation from the Township when he did not have accurate and complete SFIs on file with the Township.

Specifically, the Commission ruled:

> [Sivick] used the authority of his public positions for the private pecuniary benefit of his [Son], when he participated in discussions and actions of the Board to eliminate the Township's Nepotism Policy with the intent and for the purpose of having his [S]on hired as a Township road crew employee; when he discussed, recommended, lobbied, influenced, or sought the support of the Board to effectuate the hiring of his [S]on as a Township employee; and when he verified Township records enabling and/or otherwise directing the payment of salary/wage to his [S]on from public monies.
>
> . . . .
>
> [Sivick] used the authority of his public office as a Supervisor by participating in the aforesaid discussions[,] as well as later discussions with his fellow Supervisors[,]

---

or email me at any time with additional information. **Rohner called on his own volition** to provide additional information . . . .

. . . .

**Rohner stated that the road crew position that** [**Son**] **had obtained with the Township in June 2013 was created by** [**Sivick**] **specifically for** [**his Son**] . . . .

R.R. at 112a (emphasis added).

regarding the changes to the [Handbook] to remove the Nepotism Policy. [Sivick]'s discussions/actions to effectuate the removal of the Nepotism Policy - a policy that [Sivick] had voted to approve only a few years earlier - were undertaken with the specific intent, motivation, and purpose of enabling the hiring of [his Son] by the Township. Although [Sivick] abstained from the January 7, 2013[] vote of the Board that approved the revised [Handbook], he had already used the authority of his office to effectuate the removal of the Nepotism Policy from the [Handbook] prior to the vote.

. . . .

[Sivick] used the authority of his public office as a Supervisor when he discussed, recommended, lobbied, influenced, or sought the support of the Board to effectuate the hiring of his [S]on as a Township employee. [Sivick] "pled his case" to Vollmer about seeing his [S]on "get a chance." After the Nepotism Policy had been removed from the [Handbook], [Sivick] again asked Vollmer if it would be alright if he brought his [S]on in to be a Township employee. When Vollmer asked [Sivick] if [his Son] had qualifications for the Township position, [Sivick] responded affirmatively and informed Vollmer of his [S]on's qualifications.

First Final Adj. at 20-21 (citation omitted).

Finally, the Commission held:

[Sivick] used the authority of his public office when he used the actual power he had by being a Township Supervisor to access and influence his fellow Township Supervisors to effectuate both the elimination of the Township's Nepotism Policy and the hiring of [his S]on. Given that the Nepotism Policy would have precluded the hiring of [his S]on, and given that at least one of the Supervisors (Vollmer) raised concerns regarding hiring [his S]on, it is clear that [his Son] would not have been hired as a Township employee but for [Sivick]'s use of the authority of his public office as a Supervisor to engage in discussions with and make recommendations to his fellow Supervisors and to lobby/influence or seek the support of those Supervisors with regard to eliminating the Nepotism

8

Policy and hiring his [S]on. But for being a Supervisor, [Sivick] would not have been in a position to engage in such communications and to exert such influence to effectuate the hiring of his [S]on. [Sivick] was consciously aware of the private pecuniary benefit his [S]on would receive if hired by the Township, and [Sivick]'s actions in getting the Nepotism Policy eliminated and his [S]on hired were steps to secure that private pecuniary benefit.

*Id*. at 21-22. The Commission ordered Sivick to pay $30,000.00 in restitution to the Commonwealth, and to file complete and accurate SFIs for 2011 and 2014. Sivick appealed to this Court.

On January 3, 2019, in *Sivick v. State Ethics Commission*, 202 A.3d 814 (Pa. Cmwlth. 2019) (*Sivick I*), *appeal granted in part*, 217 A.3d 182 (Pa. 2019), and *rev'd*, 238 A.3d 1250 (Pa. 2020), this Court affirmed the Commission's First Final Adjudication. The *Sivick I* Court concluded that the Commission properly determined that Sivick had violated Section 1103(a) of the Ethics Act when he used the authority of his office to solicit the elimination of the Township's Nepotism Policy and his Son's hiring, for his Son's pecuniary gain. This Court also concluded that Sivick had violated Section 1103(a) of the Ethics Act by verifying and approving his Son's payroll records. Finally, this Court determined that the Commission acted in accordance with Section 1107(a)(2) of the Ethics Act when it ordered Sivick to pay restitution.

9

Sivick sought, and the Pennsylvania Supreme Court granted, an allowance of appeal;[14] however, the Pennsylvania Supreme Court limited its review to the following issues:[15]

> 1) Whether, under Section 1107(13) of the [Ethics Act], the [] Commission, upon a finding that a public official or public employee violated the [Ethics] Act, has the authority to order restitution when the individual who obtained financial gain is not the public official or employee, but is an immediate family member of the public official or employee?

---

[14] Sivick's Petition for Allowance of Appeal (Pa. No. 118 MAL 2019) raised the following issues:

> 1. Whether the Panel abused its discretion and erred by ordering restitution from a public official on account of wages paid by the Township to his laborer-son notwithstanding the exemption of laborers as "public employees" under the Ethics Act and avoiding other restitutional arguments of the public official by *sua sponte* dismissing his standing.

> 2. Whether the Panel erred by determining a public official commits a conflict of interest violation under the Ethics Act by inquiring and discussing, in the same way general members of the public could, the potential hiring of his [S]on under the First Amendment [, U.S. Const. amend. I,] with other elected supervisors and without evidence of threats, intimidation, any quid pro quo arrangements, or voting of any kind.

> 3. To what extent, if any, does the Ethics Act require proof of efforts to furnish improper compensation in order to sustain a conflict of interest violation?

> 4. To what extent must the Commonwealth prove alleged ethical misconduct of supervisory public employees exceeds the class/subclass exemption for conflicts of interest relative to [eight] subordinate employees, one of whom was recently added and a member of supervising public employee's immediate family?

*Id*. at 1-2 (italics added).

[15] The Pennsylvania Supreme Court's per curiam Order declared: "**AND NOW**, this 6th day of August, 2019, the Petition for Allowance of Appeal is **GRANTED, LIMITED TO** the issues set forth below. Allocatur is **DENIED** as to all remaining issues." *Sivick v. State Ethics Comm'n* (Pa., No. 118 MAL 2019, filed Aug. 6, 2019) (per curiam).

10

2) Whether the action of a public official or public employee reviewing and approving payroll records of a group of subordinate employees, one or more of whom is the public official's or employee's immediate family member, falls within the class/subclass exemption of the "conflict of interest" definition in the [Ethics Act]?

*Sivick v. State Ethics Comm'n* (Pa., No. 118 MAL 2019, filed Aug. 6, 2019) (*per curiam*). The Pennsylvania Supreme Court did <u>not</u> grant allowance of appeal on the issue of whether this Court correctly concluded that the Commission properly determined that Sivick violated Section 1103(a) of the Ethics Act by using the authority of his offices to solicit the elimination of the Township's Nepotism Policy and his Son's hiring.

On October 1, 2020, in *Sivick v. State Ethics Commission*, 238 A.3d 1250 (Pa. 2020) (*Sivick II*), the Pennsylvania Supreme Court reversed this Court's *Sivick I* decision, held that Sivick did not violate Section 1103(a) of the Ethics Act by reviewing and approving his Son's timesheets, and declared that Section 1107(13) of the Ethics Act did not authorize the Commission to order restitution where a public official or employee confers a financial benefit on an immediate family member.

The *Sivick II* Court explained:

Having established that one of the three stated bases for the Commission's finding that Sivick violated Subsection 1103([a]) of the [Ethics] Act is infirm *and* that the Commission lacked statutory authority to impose restitution under the circumstances of this case, we now must address how to proceed on remand. Although conflict of interest is a felony, the Commission's approach to this case was not like a conventional criminal matter, which typically proceeds by reference to individual counts as to each of which a defendant is convicted or acquitted, with certain potential penalties attaching to each conviction. By contrast, **the Commission's adjudication identified three distinct but interrelated actions as violating [S]ection 1103(a) [of the Ethics Act] without**

11

> **making clear whether each cited basis was sufficient by itself**, **or whether the violation was based upon aggregating the cited wrongdoing into one course of conduct**. This creates a degree of uncertainty that is only exacerbated by the Commission's imposition of a single sanction. It is exacerbated further still, now, by this Court's determination that the lone sanction imposed lacked a statutory basis - and was, in a sense, an illegal sentence. The parties do not address this complication, which was immaterial to the court below because it affirmed the Commission's [First Final] Adjudication.
>
> When an appellate court invalidates any among a number of convictions in a given case, or otherwise deems invalid any component of a sentencing scheme in such a matter, we assume that the court, having imposed sentence with an overarching understanding of the aggregate sanction, should have the opportunity to fashion a new judgment of sentence. Here, it isn't even entirely clear that the Commission would have found a conflict of interest violation at all without one of its three cited bases for the violation deemed invalid. But even if the Commission sustains its finding of a conflict of interest violation on the cited bases that remain undisturbed by our ruling, it may well wish to consider alternative sanctions available to it under Section 1109 of the [Ethics] Act. That is the Commission's decision to make on remand.

*Sivick II*, 238 A.3d at 1266-67 (emphasis added; footnotes omitted). Thus, the *Sivick II* Court vacated the Commission's First Final Adjudication, and remanded the matter to the Commission for further proceedings, including, in the Commission's discretion, the entry of a new adjudication and, if appropriate, the imposition of any sanction available under the Ethics Act.

On February 25, 2021, the Commission mailed its Adjudication After Remand addressing the remaining charges. The Commission again concluded that Sivick violated Section 1103(a) of the Ethics Act by using the authority of his office for his Son's private pecuniary benefit by initiating discussions and taking action to eliminate the Township's Nepotism Policy in order to effectuate his Son's hiring.

12

Further, the Commission's findings of fact, discussion, and conclusions of law are almost identical to those in its First Final Adjudication.

> The Commission ruled:
>
> [Sivick] used the authority of his public office as a Township Supervisor by participating in the aforesaid discussions as well as later discussions with his fellow Supervisors regarding the changes to the [Handbook] to remove the Nepotism Policy. [**Sivick's**] **discussions/actions to effectuate the removal of the Nepotism Policy** - a policy that [Sivick] had voted to approve only a few years earlier - **were undertaken with the specific intent**, **motivation**, **and purpose of enabling the hiring of** [**his Son**], **by the Township**. Although [Sivick] abstained from the January 7, 2013[] vote of the Board that approved the revised [Handbook], **he had already used the authority of his office to effectuate the removal of the Nepotism Policy from the** [**Handbook**] prior to the vote.
>
> . . . .
>
> [**Sivick**] further used the authority of his public office as a Township Supervisor when he discussed, recommended, **lobbied**, **influenced**, **or sought the support of the Board to effectuate the hiring of his** [**S**]**on as a Township employee**. [Sivick] "pled his case" to Vollmer about seeing his [S]on "get a chance." After the Nepotism Policy had been removed from the [Handbook], [Sivick] again asked Vollmer if it would be alright if he brought his [S]on in to be a Township employee. When Vollmer asked [Sivick] if [his Son] had qualifications for the Township position, [Sivick] responded affirmatively and informed Vollmer of his [S]on's qualifications.

Adj. After Remand at 21 (citation omitted).

> Finally, the Commission held:
>
> [Sivick] used the authority of his public office when he used the actual power he had by being a Township Supervisor to access and influence his fellow Township Supervisors to effectuate both the elimination of the Township's Nepotism Policy and the hiring of [his Son].

13

**Given that the Nepotism Policy would have precluded the hiring of [his S]on**, and given that at least one of the Supervisors (Vollmer) raised concerns regarding hiring [his S]on, **it is clear that [his Son] would not have been hired as a Township employee but for [Sivick's] use of the authority of his public office as a Supervisor to engage in discussions with and make recommendations to his fellow Supervisors and to lobby/influence or seek the support of those Supervisors with regard to eliminating the Nepotism Policy and hiring his [S]on**. But for being a Supervisor, [Sivick] would not have been in a position to engage in such communications and to exert such influence to effectuate the hiring of his [S]on. [Sivick] was consciously aware of the private pecuniary benefit his [S]on would receive if hired by the Township, and [Sivick's] actions in getting the Nepotism Policy eliminated and his [S]on hired were steps to secure that private pecuniary benefit.

Adj. After Remand at 22 (emphasis added).

Unlike the First Final Adjudication, the Commission did not order restitution, but rather, directed that the matter be referred to the Pike County District Attorney with the recommendation that criminal charges be initiated against Sivick. Sivick appealed to this Court.[16]  On March 26, 2021, the Commission filed an

---

[16] "This Court's review is limited to determining whether the Commission's necessary factual findings are supported by substantial evidence or whether the Commission committed an error of law." *Quaglia v. State Ethics Comm'n*, 986 A.2d 974, 979 n.7 (Pa. Cmwlth. 2010).

> During appellate review, the "substantial evidence" test must first be applied to determine whether each of the necessary findings of fact relied upon for the determination of a violation are supported by substantial evidence.  After the facts are found to be supported, this Court must then consider whether all the facts found by the Commission are "clear and convincing proof" that [the] [p]ublic [o]fficial violated the [Ethics] Act.

*Pulice v. State Ethics Comm'n*, 713 A.2d 161, 163 (Pa. Cmwlth. 1998) (citation omitted). Further,

> [s]tatutory interpretation is a question of law, for which our standard of review is *de novo*, and our scope is plenary. [S]ee *Malt Beverages Distrib[s.] Ass'n v. P[a.] Liquor Control B[d.]*, . . . 974 A.2d 1144, 1154 ([Pa.] 2009) (citing *Seeton v. P[a.] Game Comm['n]*, . . . 937

14

Application for Summary Relief (Application for Summary Relief) which this Court listed for disposition along with the merits of Sivick's appeal.

> Initially,
>
> > [t]he Ethics Act is remedial legislation with the salutary purpose of assuring the integrity and honesty of [] Commonwealth employees and, as such, must be "liberally construed." Section 1101.1(a) of the Ethics Act[, 65 Pa.C.S. § 1101.1(a)]; *Maunus v. State Ethics Comm'n*, . . . 544 A.2d 1324, 1328 ([Pa.] 1988). Consequently, **the coverage of the Ethics Act must be construed broadly**, **and its exclusions must be construed narrowly**.

*Quaglia v. State Ethics Comm'n*, 986 A.2d 974, 979 (Pa. Cmwlth. 2010) (emphasis added).

> > The Commission bears the burden of proving a violation of the Ethics Act. In order to find a violation of the Ethics Act, at least four members of the Commission must find clear and convincing proof of a violation. Clear and convincing proof is evidence that is so clear, direct, weighty, and convincing that it enables the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts at issue.

*G.L. v. State Ethics Comm'n*, 17 A.3d 445, 453 (Pa. Cmwlth. 2011) (citations omitted).

Sivick argues that the Commission erred by concluding that he violated the conflict of interest prohibition in Section 1103(a) of the Ethics Act due to his discussions with the Supervisors for the purpose of eliminating the Nepotism Policy

---

A.2d 1028, 1037 ([Pa.] 2007)[,] for the proposition that "while courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court").

*Kistler v. State Ethics Comm'n*, 22 A.3d 223, 227 (Pa. 2011) (citation omitted).

so the Township could hire his Son, and the actions he took to effectuate his Son's hiring.

Section 1103(a) of the Ethics Act prohibits a "public official or public employee [from] engag[ing] in conduct that constitutes a conflict of interest." 65 Pa.C.S. § 1103(a). Section 1102 of the Ethics Act defines "[c]onflict" or "conflict of interest" as:

> **Use by a public official** or public employee **of the authority of his office or employment** or any confidential information received through his holding public office or employment **for the private pecuniary benefit of himself**, **a member of his immediate family**[17] or a business with which he or a member of his immediate family is associated. The term does not include an action having a *de minimis* economic impact or which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. § 1102 (italics and bold emphasis added). "Thus, in order to prove a violation, the Commission must establish by clear and convincing proof that: (1) a public official[18] (2) used the authority of his office (3) for the private pecuniary gain

---

[17] The Ethics Act defines "[i]mmediate family" as "[a] parent, spouse, child, brother[,] or sister." 65 Pa.C.S. § 1102.

[18] The Ethics Act defines "[p]ublic official" as:

> Any person elected by the public or elected or appointed by a governmental body or an appointed official . . . of this Commonwealth or any political subdivision thereof, provided that it shall not include members of advisory boards that have no authority to expend public funds other than reimbursement for personal expense or to otherwise exercise the power of the [s]tate or any political subdivision thereof.

65 Pa.C.S. § 1102. Sivick does not dispute that he was a public official during the relevant time periods.

of himself[, a member of his immediate family] or a business with which he is associated." *G.L.*, 17 A.3d at 453.

Section 1102 of the Ethics Act defines the term "[a]uthority of office or employment" as "[t]he actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office or position of public employment." 65 Pa.C.S. § 1102. With respect to the *use* of the authority of office necessary to violate Section 1103(a) of the Ethics Act, the Pennsylvania Supreme Court has explained:

> [T]o violate subsection 1103(a) [of the Ethics Act], a public official must "**use**" his or her office for private pecuniary benefit. *Kraines v. P[a.] State Ethics Comm['n]*, 805 A.2d 677, 681 (Pa. Cmwlth. 2002). The word "use" is not defined in the Ethics Act. The dictionary definition of the noun "use" is "[t]he act of using or putting to a purpose[, *e.g.*,] the use of a car;" analogously, the definition of the verb "use" is "1. [t]o bring or put into service or action: employ[, *e.g.*,] use a pen [or] use your imagination[, or] 2. to put to some purpose: avail oneself of[, *e.g.*,] use the bus to get to work." Webster's II New College Dictionary, Houghton Mifflin Co., 1995, at 1215. Thus, the common and approved usage of the word "use," which must guide our inquiry, indicates an action directed toward a purpose. Accordingly, to violate [Section] 1103(a) [of the Ethics Act], a public official must act in such a way as to put his office to the purpose of obtaining for himself a private pecuniary benefit. Such directed action implies awareness on the part of the public official of the potential pecuniary benefit as well as the motivation to obtain that benefit for himself.
>
> That the General Assembly intended such an interpretation of [S]ection 1103(a) [of the Ethics Act] is strengthened by a declaration in the Ethics Act's purpose provision: "The Legislature hereby declares that public office is a public trust and that any **effort** to realize personal financial gain through public office other than compensation provided by law is a violation of that trust." 65 Pa.C.S. § 1101.1(a) Purpose (emphasis added).

17

*Kistler v. State Ethics Comm'n*, 22 A.3d 223, 227-28 (Pa. 2011) (underline emphasis added).

> Further,
>
> > to violate the conflict of interest provision in [S]ection 1103(a) of the Ethics Act, <u>a public official must be consciously aware of a private pecuniary benefit for himself, his family, or his business, and then must take action in the form of one or more specific steps to attain that benefit</u>. . . . [T]his interpretation derives from the plain meaning of the statutory definition of conflict of interest, which requires that a public official **use** the authority of his office for private pecuniary benefit.

*Id*. at 231 (underline emphasis added).

In *Kistler*, a member of an intermediate unit board of directors voted to authorize an architect to pursue construction of a school while simultaneously seeking a subcontract for his business from the same individual. The Pennsylvania Supreme Court held that the Commission erred by holding that Kistler had violated the Ethics Act because there was "no evidence that [Kistler] had acted with awareness that his . . . vote . . . could or would result in his receipt of a subcontract . . . ." *Id*.

In *Pulice v. State Ethics Commission*, 713 A.2d 161 (Pa. Cmwlth. 1998), Pulice, a school district board of directors president, was charged with violating the Ethics Act's conflict of interest provision by participating in meetings from which a new assistant principal position was created, and by voting two months later to hire his son-in-law for the newly-created position. In concluding that no violation had been proven, this Court reasoned:

> [The] facts found by the Commission present strong, uncontradicted evidence that this newly[-]created position was not created specifically to promote or otherwise benefit [the] son-in-law, but was for the benefit of the [d]istrict. There is no evidence at all from which it can be inferred, rather than speculated, that [Pulice] "used his

18

authority" for the private pecuniary benefit of [his] son-in-law by voting for the creation of the new position.[19] At the time that [Pulice] voted on the creation of the new position there were no applicants. Consequently, there is not even substantial evidence, let alone clear and convincing evidence that supports the Commission['s] adjudication that [Pulice] violated [S]ection 3(a) of the [State Ethics Law[20]] . . . .

*Pulice*, 713 A.2d at 164.

Unlike in *Kistler* and *Pulice*, the evidence in this case reflects Sivick's intent to have the Township remove the Nepotism Policy from the Handbook for the purpose of hiring his Son, and Sivick's intent that the Township hire his Son. In fact, Sivick, after referencing the *Kistler* standard, **<u>admits</u>** his "conscious awareness that his [S]on would be benefitted, i.e.[,] the mens rea element," but he argues that there is "no evidence that [he] used 'the actual power provided by law' related to his position, i.e.[,] the actus reus element, for the private pecuniary benefit of his [S]on." Sivick Br. at 18. In other words, Sivick concedes that he was "consciously aware of a private pecuniary benefit for himself, his family, or his business," but strenuously disputes that he "t[ook] action [using the authority of his office] in the form of one or more specific steps to attain that benefit." *Kistler*, 22 A.3d at 231.

The Commission has repeatedly and consistently explained that "[u]se of authority of office is more than the mere mechanics of voting[,] and encompasses all of the tasks needed to perform the functions of a given position. Use of authority includes . . . discussing, conferring with others, and lobbying for a particular

---

[19] Here, in contrast, Rohner told the Investigative Division that Sivick specifically created the Township position for his Son. *See* R.R. at 112a.

[20] The original State Ethics Law, Act of October 4, 1978, P.L. 883, was reenacted and amended by the Act of June 26, 1989, P.L. 26, *formerly* 65 P.S. § 403(a). The original State Ethics Law was repealed by the Act of October 15, 1998, P.L. 729, and replaced by the Ethics Act.

The *Pulice* Court also concluded that the Ethics Act's conflict of interest provision did not apply to in-laws.

result."[21] *In re Gallen*, Comm'n Order No. 1198, at 37 (2001) (citation omitted); *see also Bloom*, Comm'n Order No. 1722 (2017); *Yusko*, Comm'n Order No. 1705 (2016); *Esposito*, Comm'n Order No. 1333 (2004); *Yurek*, Comm'n Order No. 1286 (2003); *Zwick*, Comm'n Order No. 1062 (1997); *Juliante*, Comm'n Order No. 809 (1991).

Section 607 of The Second Class Township Code (Code)[22] describes the Supervisors' duties to include general Township governance and employ persons necessary for the conduct of Township business. Section 603 of the Code, 53 P.S. § 65603, requires the Board to meet at least once per month to transact business. An affirmative majority vote at a public meeting is required for the transaction of any business. *Id.* Section 2302 of the Code[23] mandates that, as Roadmaster, Sivick "shall:"

> (1) Report to the [Board] any information that may be required by the [Board] and by the Department of Transportation.
>
> (2) Inspect all roads and bridges as directed by the [Board].
>
> (3) Do or direct to be done all work necessary to carry out the responsibilities imposed by the [Board] with respect to the maintenance, repair and construction of [T]ownship roads.

53 P.S. § 67302.

The Code governs and authorizes the Supervisors' authority to engage in meetings for the purpose of conducting Township business.[24] Clear and

---

[21] Although the issue before this Court is a question of law, the Court may consider the interpretation of the agency charged with administrating the statute at issue. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a), provides that the object of statutory interpretation is to ascertain and effectuate the General Assembly's intent.

[22] Added by Section 1 of the Act of November 9, 1995, P.L. 350, 53 P.S. § 65607.

[23] Added by Section 1 of the Act of November 9, 1995, P.L. 350, 53 P.S. § 67302.

[24] Such discussions are deemed "deliberation[s]" under Section 703 of the Sunshine Act. 65 Pa.C.S. § 703 ("The discussion of agency business held for the purpose of making a decision.").

convincing record evidence reflects that Board Chairman, Supervisor, and Roadmaster Sivick met with Vollmer and Menditto to initiate and promote official Board action to eliminate the Township's Nepotism Policy, directed Menditto not to prepare an errata sheet reflecting the change to the Handbook,[25] and met to discuss and encourage his Son's hiring. Thus, Sivick's access to and influence over the other Supervisors was rooted in his official authority, as "actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to" his position as Board Chairman, Supervisor and Roadmaster. 65 Pa.C.S. § 1102. Regardless of whether Sivick's interactions with the other Supervisors about repealing the Nepotism Policy and hiring his Son were considered requests, recommendations or veiled heavy-handed mandates, they were nevertheless made in his capacity as Board Chairman, Supervisor and Roadmaster, and were made for the purpose of obtaining a Township job for his Son. Sivick's use of his authority to promote his Son's hiring was the use of "actual power provided by law[.]" 65 Pa.C.S. § 1102.

The fact that Sivick abstained from voting to remove the Nepotism Policy from the Handbook and to hire his Son is not dispositive when he initiated and encouraged the other Supervisors to eliminate the Nepotism Policy so the Board could vote on his Son's hiring, directed that no errata sheet be created, and then lobbied the Township to hire his Son. Notably, in *Sivick II*, the Pennsylvania Supreme Court, in dicta, contrasted the facts in *Kraines*[26] with Sivick's actions, observing:

---

[25] Absent his role as a Supervisor, Sivick would not have had the authority or influence to demand that no errata sheet be created.

[26] In *Kraines*, this Court reversed the Commission's adjudication declaring that a county controller violated the Ethics Act's conflict of interest provisions when she signed payroll checks to her husband, a forensic pathologist who provided services to her county. This Court found that Kraines did not improperly use her office to gain pecuniary benefits to which her husband was not entitled because he had been performing autopsies for the county years before Kraines was county

21

> To be sure, there are differences between this case and *Kraines*. In particular, the sum of Kraines' behavior in that case was clearly less blameworthy than was Sivick's **in this case, where the Commission found other bases for violations in connection with Sivick's role in soliciting the elimination of the [N]epotism [P]olicy and the hiring of [his] Son in the first instance**. __In those actions, Sivick plainly "used" his office to facilitate [__his__] Son's private pecuniary benefit__.[27]

*Sivick II*, 238 A.3d at 1261 (bold and underline emphasis added).

The Commission found that Sivick "participated in discussions and actions of the Board to eliminate the Township's Nepotism Policy with the intent and for the purpose of having his [S]on hired as a Township road crew employee." Adj. After Remand at 21. The Commission also found that Sivick "discussed, recommended, lobbied, influenced, or sought the support of the Board to effectuate the hiring of his [S]on as a Township employee." *Id*. Based on this Court's record review, substantial record evidence supports the Commission's findings that Sivick engaged in such conduct.

Curiously, despite admitting to satisfying *Kistler's* mens rea element - Sivick's conscious awareness of a **pecuniary benefit** - Sivick, citing *Commonwealth*

---

controller. In addition, Kraines had no role in the county coroner's decision to use her husband's services and had no involvement in the amount her husband and other pathologists were paid.

[27] The Pennsylvania Supreme Court has described *obiter dictum* as "[a] judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential . . . ." *Commonwealth v. Lee*, 935 A.2d 865, 867 n.4 (Pa. 2007) (quoting Black's Law Dictionary 1100 (7th ed. 1999)); *see also Commonwealth v. Romero*, 183 A.3d 364, 400 n.18 (Pa. 2018) (quoting Black's Law Dictionary 1240 (10th ed. 2014), defining *obiter dictum* as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (*although it may be considered persuasive*")) (emphasis added).

Here, because the conflict of interest issues regarding the Nepotism Policy removal and Son's hiring were not before the *Sivick II* Court, the Supreme Court's statement that "in soliciting the elimination of the Nepotism Policy and the hiring of Son in the first instance[,]" "Sivick plainly 'used' his office to facilitate [his] Son's private pecuniary benefit[,]" *Sivick II*, 238 A.3d at 1261, is non-binding dicta, it is nonetheless persuasive.

22

*v. Veon*, 150 A.3d 435, 446-48 (Pa. 2016), argues that regarding the actus reus element, "the 'actual power provided by law[,]' [65 Pa.C.S. § 1102,] must yield a private pecuniary benefit, not merely a political impact[,]" **and no such pecuniary benefit exists**.[28]  Sivick Br. at 28.

The Ethics Act does not define the term "private pecuniary benefit[.]" 65 Pa.C.S. § 1102.  In *Veon*, the Pennsylvania Supreme Court held that "[a] pecuniary benefit or detriment must be financial.  While it may not be possible to come up with a to-the-dollar value of a given pecuniary benefit, various statutes make clear that difficulties with precise quantification do not preclude grading of the offense by assessment of value." *Veon*, 150 A.3d at 446 (footnote omitted).  Thus, "to prove 'pecuniary benefit' as used in the conflict of interest statute, the prosecution must show some private **financial** gain." *Id.* at 448 (emphasis added). The *Veon* Court held that pecuniary benefit does not include "intangible political gains." *Id.* at 448.  Relying on *Veon*, Sivick argues that, at most, his comments and discussions only had a political impact on the other Supervisors, and could not have furnished an economic benefit to his Son.

Specifically, Sivick contends:

> Here, the statements *may* have had a political impact upon the other supervisors, but the [Ethics] Act requires more to constitute a violation.  There must be an economic impact for himself or his [S]on from the official actions of Sivick himself.  Because Sivick's non-official comments and discussions only had a political impact at most on the other members of the [Board], Sivick's comments and discussions could not in any capacity furnish an economic benefit to his [S]on.  The [S]on did not receive a single

---

[28] In *Sivick II*, the Court, citing to *Veon*, noted, "[f]or present purposes, we assume *arguendo* that Son's receipt of fair compensation for services duly rendered qualifies as a 'private pecuniary benefit' bestowed upon a member of Sivick's immediate family." *Sivick II*, 238 A.3d at 1259 n.39.

23

dollar, nor could he, until the other members of the Board actually hired the [S]on.

Sivick Br. at 29.

Sivick's argument ignores the fact of his admitted intent to obtain Township employment for his Son - **not** some "intangible political gain." *Veon*, 150 A.3d at 447. The record evidence reflects that Sivick's clear goal was to see the Township employ his Son, and he used the authority of his office to achieve that outcome. As a result, Son received gross earnings of $126,552.24 (net earnings of $87,949.36) from a job he would not have had, but for Sivick's use of his authority of office in having the Nepotism Policy removed from the Handbook and having the Board hire his Son. Sivick's actions resulted in a private pecuniary benefit to his Son.

Recently, in *Commonwealth v. Como* (Pa. Super., No. 1687 EDA 2018, filed November 23, 2020),[29] the Pennsylvania Superior Court affirmed a school district superintendent's conflict of interest conviction for, *inter alia*, "violating the Ethics Act by procuring a job for his son[, i.e., a pecuniary benefit] . . . as a [school district] night supervisor, a custodial position." *Id*., slip op. at 34. The *Como* Court concluded:

> The evidence demonstrates that [the superintendent] used the authority of his position **for his son's pecuniary benefit**. He placed his son before the [s]chool [b]oard as the lone candidate for the job by overriding [the school district manager's] selection for the night supervisor position, selecting his son instead, and failing to inform the [s]chool [b]oard about these behind-the-scene steps he took to position his son as the candidate.

*Id*., slip op. at 36 (emphasis added). Similarly, Sivick "used the authority of his position for [his Son's] pecuniary benefit." *Id*. In its Adjudication After Remand,

---

[29] Pursuant to Pennsylvania Superior Court Internal Operating Procedure 65.37, "[n]on-precedential decisions filed after May 1, 2019, may be cited for their persuasive value[.]" 210 Pa. Code § 65.37.

the Commission properly concluded that Sivick's "use of the authority of his office . . . resulted in a private pecuniary benefit consisting of the compensation [his Son] received from the Township for a job he would not otherwise have held." Adj. After Remand at 23. Accordingly, Sivick's argument contending the absence of a pecuniary benefit fails.

The record evidence reflects that Sivick violated Section 1103(a) of the Ethics Act when he took the above-referenced actions.[30] Accordingly, the Commission properly determined based on clear and convincing evidence that Sivick violated Section 1103(a) of the Ethics Act's conflict of interest prohibition when he lobbied for the removal of the Nepotism Policy and for his Son's hiring.

---

[30] Sivick also argues that "[t]he inquiries made by Sivick should be treated in a manner consistent with the First Amendment[ to the United States Constitution, U.S. Const. amend. I]." Sivick Br. at 29. However, the Commission, as trier of fact, found Sivick's conduct far more intrusive than mere "inquiries[.]" Sivick Br. at 21.

Sivick contends that Pennsylvania courts have "reminded the Commission to remain within the parameters of the statutory language itself," citing to *Sivick II*, *Kistler*, and *Commonwealth v. Orie*, 88 A.3d 983 (Pa. Super. 2014). Sivick Br. at 30. Notably, in *Sivick II*, the Pennsylvania Supreme Court noted that in lobbying for the removal of the Nepotism Policy and Son's hiring, "Sivick plainly 'used' his office to facilitate Son's private pecuniary benefit." *Sivick II*, 238 A.3d at 1261. In *Kistler*, the Pennsylvania Supreme Court merely disagreed with the Commission's statutory interpretation, "declin[ing] to infer that when the General Assembly chose to use the phrase 'an open and public process' in the context of subsection 1103(f) [of the Ethics Act], its actual intent was to specify a competitive bidding process." *Kistler*, 22 A.3d at 235. In *Orie*, the Superior Court **rejected** a claim that the Ethics Act impermissibly intruded on First Amendment rights, stating: "[T]he [Ethics Act] places no restrictions on a public official's federal or state protected rights of expression and association, but only prohibits officials from using state-funded resources for non-*de minimis* private pecuniary gain." *Id*. at 1026. Accordingly, Sivick's argument is without merit.

For all of the above reasons, the Commission's Adjudication After Remand and Order is affirmed.[31, 32]

_____
ANNE E. COVEY, Judge

---

[31] In its brief, the Commission contends that this Court should dismiss Sivick's appeal based on the law of the case doctrine. Because the Pennsylvania Supreme Court vacated the Commission's First Final Adjudication, this Court reviewed the merits of the Commission's Adjudication After Remand.

[32] Given this Court's disposition of the merits of Sivick's appeal, the Commission's Application for Summary Relief is dismissed as moot.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John P. Sivick,                                          :
         Petitioner               :
                                        :
         v.                                         :
                                          :
Commonwealth of Pennsylvania,                            :
State Ethics Commission,                                 :    No. 307 C.D. 2021
         Respondent               :

### O R D E R

AND NOW, this 22nd day of December, 2021, the Commonwealth of Pennsylvania State Ethics Commission's (Commission) February 3, 2021 final adjudication and order is affirmed.

The Commission's Application for Summary Relief is dismissed as moot.

_____
ANNE E. COVEY, Judge